## ADAM OCHS *et al.*

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 9, 1888.*

1. CRIMINAL LAW—*indictment—one good count—general verdict.* On a general verdict of guilty, one good count in the indictment will be sufficient to sustain the conviction, even though there are other counts which are defective.

2. SAME—*limit of time for bringing accused to trial—under the statute.* The object of section 438 of the Criminal Code, is to fix an absolute limit of time within which the prosecution must bring the prisoner to trial, beyond which there shall be no continuance on account of the absence of evidence for the People, and to fix as this limit three terms of the court, exclusive of the term at which the prisoner is committed or admitted to bail, which is not to be counted as the first term.

3. SAME—*conspiracy—to do that which is impossible.* There may be a conspiracy to obtain the money of another by false pretences, although the accomplishment of the object of the conspiracy may be impossible.

4. SAME—*Conspiracy act of 1877—whether repealing section 46 of the Criminal Code.* Section 46 of the Criminal Code, providing for the punishment of persons conspiring to obtain the money of another by false pretences, etc., is not in any way modified or repealed by the act of 1877, entitled "An act to define and punish conspiracies in the State of Illinois."

5. SAME—*conspiracy to injure the business, etc., "of another"—as including municipal corporations.* The language of section 46 of the Criminal Code, relating to conspiracies to injure the person, character, business or property "of another," etc., is broad enough to include municipal corporations as within its protection. The word "another" includes such corporations, under the statutory construction that the word "person" or "persons," as well as all words referring to or importing persons, may extend and be applied to bodies politic and corporate, as well as to individuals.

6. SAME—*conspiracy—how to be established.* A conspiracy may be proved either expressly, or by the proof of facts from which the jury may infer it; but in nearly all the cases it is shown in the latter mode. While it is more desirable to show an intimacy between the defendants charged with conspiring, and private meetings or consultations, it is not necessary to do so in order to the admission of proof of the overt acts of each of the defendants, as the jury may imply the conspiracy from such overt acts.

7. Though the common design is of the essence of the charge of conspiracy, it is not necessary to prove that the defendants came together, and

actually agreed, in terms, to have that design, and to pursue it by a common means. If it be proved that defendants pursued, by their acts, the same object, often by the same means, one performing one part and another executing another part of the same, so as to complete it, with a view to the attainment of the same object, the jury may be justified in the conclusion that they were engaged in a conspiracy to effect that object.

8. In this case, on the trial of certain county commissioners for a conspiracy to obtain the money of the county by means of false pretences or false and fraudulent bills against the county, the proof showed many cases of commissions charged by the defendants for awarding contracts, and paid to them, which were made up by false bills presented to the county board, and allowed. In some instances the proof failed to show whether false and fraudulent bills were rendered, and in a few the contractors testified that they rendered fair and true bills: *Held,* that there was no error in allowing the latter transactions to be laid before the jury. In such case it is not essential to the crime that money should have been actually obtained by the false pretences, or that such false pretences should have been used. It is enough if there was a conspiracy to obtain money by false pretences, and it was properly left to the jury to say whether such a conspiracy existed in respect of such transactions.

9. SAME—*entering into conspiracy already formed.* On the trial under an indictment for a conspiracy, it is not necessary to prove that the conspiracy originated with the defendants, or that they met during the process of its concoction, for the reason that every person entering into a conspiracy or common design already formed, is deemed, in law, a party to all acts done by any of the other parties, before or afterward, in furtherance of the common design.

10. SAME—*transaction for the benefit of only a portion of the conspirators.* On indictment against members of a county board for a conspiracy to defraud the county by means of false pretences, to-wit, false and fraudulent bills of contractors against the county, the court allowed the People to show that one of the defendants made out a bill for the sale of his own property to the county, in the name of another, upon which he received the price allowed, it not appearing that the other defendants had any profit in the matter: *Held,* that there was no error in the admission of the evidence, it being immaterial whether the transaction was for the benefit of one or a portion of the defendants, or for the benefit of all.

11. SAME—*limitation—when the statute begins to run—in the case of a conspiracy.* On the trial of parties for a conspiracy to obtain the money of another by false pretences, an instruction telling the jury that the crime was complete and the offence was then committed when the agreement or confederating was entered into, and that the period of limitation would commence from the time of committing the offence, is calculated to mislead, by causing the jury to understand that the limitation would commence to run from the time defendants first became members of the conspiracy,

instead of from the time of the commission of the last overt act in further-ance of the object of the conspiracy.

12. Same—*obtaining money by false pretences—by agent from principal.* An agent may be guilty of the crime of obtaining money by false pretences from his principal. In such case, the knowledge of the agent that the pre-tences were false, is not that of the principal. So county commissioners may be guilty of obtaining money from the county by the false pretence of a false and fraudulent bill, although they, individually, know the bill to be false and fraudulent.

13. Same—*reasonable doubt—applying the rule to conflict of evidence.* There is no error in refusing an instruction for a defendant in a criminal case, which seeks to apply the rule or doctrine of reasonable doubt to the case of conflict of testimony as to the time when the offence was committed. The application of the rule should be invoked upon the question of guilt upon the whole case, or some entire matter of defence or element of the crime.

14. Pleading and evidence—*relevancy, under the issue.* On the trial of members of a county board for a conspiracy to obtain money of the county by false and fraudulent pretences, evidence of the payment of money by a party, to the defendants, or some of them, for voting that no appeal be taken from a judgment against the county, is not proper, as it has no tendency to show the intention to obtain money from the county. Such evidence shows bribery, only.

15. Jury—*discharging a juror—for what cause.* The trial court has the discretionary power, in a criminal case, to discharge a juror after he has been accepted and sworn, and this power is not confined to the case of dis-qualification of the juror. The fact that he is returned as a juror through outside influence, and under suspicious circumstances, is sufficient cause for his discharge.

16. Same—*incompetent juror adjudged competent—peremptory chal-lenges not yet exhausted.* Where the prisoner has not exhausted his per-emptory challenges, he will not be heard to complain of irregularities that may intervene in the selection of the jury. He can not object unless an objectionable juror is forced on him after the exhaustion of his peremptory challenges.

17. Error *will not always reverse.* A judgment will not be reversed for error which may intervene, if it appears, from the whole record, that such error could not reasonably have affected the result.

18. Same—*assigning for error that which the party himself had sought.* A party can not be allowed to conplain of an instruction when he has him-self asked one of the same kind, in substance.

19. Practice—*improper treatment of a witness, in the mode of his ex-amination.* On the trial of county commissioners for conspiracy to obtain county money by the allowance of false and fraudulent bills, a witness who

26—124 Ill.

had had dealings with the board was called by the People, and testified. On cross-examination he was asked, "When did you commence stealing from the county by giving false weights and measures?" and "When did you first commence swindling the county?" The witness had not said he had done either of these things: *Held,* that the questions were abusive and improper, and rightly excluded by the court.

20. SAME—*improper remarks of counsel to jury.* The prosecution should never assume or indulge in harshness of bearing or intemperate language against a prisoner on trial. But when such course is provoked by improper remarks on the part of the defence, and the case tried is one that naturally occasions indignation, the judgment will not be reversed on account of some intemperate remarks of counsel for the State.

WRIT OF ERROR to the Appellate Court for the First District; —heard in that court on writ of error to the Criminal Court of Cook county; the Hon. EGBERT JAMIESON, Judge, presiding.

Mr. ALEXANDER SULLIVAN, and Mr. WILLIAM BROWN, for the plaintiffs in error:

The defendants were entitled to be discharged. Rev. Stat. chap. 38, sec. 438.

The defendants were not properly on trial for the offence for which judgment was rendered. The judgment was under section 49 of the Criminal Code.

After a juror has been accepted and sworn, the court may discharge for cause, only. *Stone* v. *People,* 2 Scam. 336; 1 Bishop on Crim. Proc. sec. 932, note 1; sec. 945, note 1; secs. 946, 948; *Commonwealth* v. *Webster,* 5 Cush. 295; *Commonwealth* v. *Rogers,* 7 Metc. 500; *Mosely* v. *State,* Blackf. 593; *State* v. *Cameron,* 2 Chand. 172; *State* v. *Groome,* 10 Iowa, 308; *Commonwealth* v. *Wade,* 17 Pick. 395; *Van Blaricum* v. *People,* 16 Ill. 364; *Logg* v. *People,* 8 Bradw. 99.

That the conduct of the court and counsel for the People was error, see *Horne* v. *State,* 1 Kan. 74; *Ritzman* v. *People,* 110 Ill. 362; *Jackson* v. *People,* 18 Bradw. 512; *Austin* v. *People,* 102 id. 261; *Baker* v. *People,* 105 id. 452.

The objects laid in the indictment as the purpose of the conspiracy, and the means laid in the indictment as the

means to be used by the conspirators, must be proved as laid. Archbold's Crim. Pr. and Pl. 1847; *United States* v. *Mitchell,* 1 Hughes, 439; *Evans* v. *People,* 90 Ill. 384; *United States* v. *Goldberg,* 7 Biss. 175; *State* v. *Tramwell,* 2 Ired. 379; *Commonwealth* v. *Kellogg,* 7 Cush. 447; 3 Greenleaf on Evidence, sec. 17.

This rule protects the accused from conviction on proof of any other offence than that he is called upon to defend. *Gutchins* v. *People,* 21 Ill. 641; *Kribs* v. *People,* 82 id. 425; *Evans* v. *People,* 90 id. 384; *Rex* v. *Timothy,* 1 F. & F. 39; *Rex* v. *Barry,* 4 id. 389.

Knowledge and intent on the part of a person charged, are necessary to make him a conspirator, as well as to make his acts and declarations evidence of the conspiracy. *Pollman's case,* 2 Campb. 233; *Evans* v. *People,* 90 Ill. 384; *People* v. *Powell,* 63 N. Y. 88; *People* v. *Mather,* 4 Wend. 230; *United States* v. *Goldberg,* 7 Biss. 175; *United States* v. *Nunemacher,* id. 111.

There must be established between the conspirators a union of wills and sentiment, and concert and co-operation in acts. *United States* v. *Goldberg,* 7 Biss. 174; *Regina* v. *Murphy,* 8 C. & P. 297; *Commonwealth* v. *McLean,* 2 Pars. (Pa.) 368; *People* v. *Mather,* 4 Wend. 230; *Commonwealth* v. *Hunt,* 4 Metc. 111; Carson on Conspiracy, 123.

The acts which are admissible in evidence of conspiracy are those done in pursuance of, to advance the object of, the conspiracy, and done while the conspiracy is in progress, and before completion or abandonment; and the declarations admissible in evidence of a conspiracy are those only which are in themselves acts, or which accompany acts, and are not merely narrative. Carson on Conspiracy, 213-217; *State* v. *Jackson,* 29 La. 354; *Clinton* v. *Estes,* 20 Ark. 216; *State* v. *Larkins,* 49 N. H. 39; *Page* v. *Parker,* 40 id. 47; *Lynes* v. *State,* 36 Miss. 617; *State* v. *Ross,* 29 Mo. 32; *State* v. *Fredericks,* 85 id. 145.

If A, B and C engage in one conspiracy, and if C, D and E engage in another, and E, F. and G engage in another, then A, B, C, D, E, F and G can not be convicted of one conspiracy on proof of these several conspiracies. *O'Connell* v. *Regina,* 11 C. & F. 231; *Elliott* v. *State,* 26 Ala. 40; Kelyng's C. C. 24; East's P. C. 97.

When the proof of conspiracy is circumstantial, a defendant's connection with it must be established by evidence of his own acts,—not those of others. Carson on Conspiracy, 124; *Commonwealth* v. *Judd,* 2 Mass. 329; *United States* v. *Goldberg,* 7 Biss. 175; 1 East's P. C. 96.

The court must be able to say, judicially, that the defendants were not prejudiced by the admission of improper evidence. *Miller* v. *People,* 39 Ill. 457; *Pollard* v. *People,* 69 id. 151; *Holbrook* v. *Nichol,* 36 id. 166; *Clark* v. *Vorce,* 19 Wend. 232.

The essence of the crime of obtaining money under false pretences is, that the false pretences should be of a past event, or of a fact having a present existence, and not of something to happen in the future, and that the prosecutor believed that the pretence was true, and that, confiding in the truth of the pretence, and by reasons thereof, he parted with his property or his money. *State* v. *Evers,* 49 Mo. 542; *Cores* v. *Strain,* 10 Metc. 521; *State* v. *Green,* 7 Wis. 676; Wharton on Am. Crim. Law, secs. 2087-2118, 2121, 2122.

Mr. GEORGE HUNT, Attorney General, Mr. JOEL M. LONGENECKER, States Attorney, and Messrs. STILES & LEWIS, for the People: ·

There was no error in refusing to discharge the defendants. 1 Starr & Curtis' Stat. 868; *Brooks* v. *People,* 88 Ill. 327; *Gallagher* v. *People,* id. 335.

It was within the discretion of the court to discharge the three jurrors after they had been accepted and sworn. *Holt* v. *State,* 9 Tex. App. 571; *Loggins* v. *State,* 12 id. 65; *Spies*

v. *People,* 122 Ill. 1; *United States* v. *Morris,* 1 Curtis, 23; *State* v. *Durkins,* 34 La. Ann. 919; *State* v. *Pritchard,* 16 Nev. 101; *State* v. *Wiseman,* 68 N. C. 203; *State* v. *Bell,* 81 id. 591; *Thomas* v. *Leonard,* 4 Scam. 556.

This court will not reverse a judgment clearly right, for improper remarks of counsel. *Wilson* v. *People,* 94 Ill. 299; *Duffin* v. *People,* 107 id. 115; *Garrity* v. *People,* id. 162.

When the result is clearly right, a judgment will not be reversed for errors which do not affect the substantial merits. *Wilson* v. *People,* 94 Ill. 299; *Ritzman* v. *People,* 110 id. 362; *Lander* v. *People,* 104 id. 248.

As to the relevancy of evidence generally, see Wharton on Crim. Ev. secs. 23, 24.

The whole of a criminal transaction may be proved, though only part is charged in the indictment. *Kelly* v. *Burnell,* 14 Ind. 327; *State* v. *Martin,* 82 N. C. 674; *Satterwhite* v. *State,* 6 Tex. App. 609; *Commonwealth* v. *Andrews,* 132 Mass. 263; *People* v. *Ward,* 3 Park. Crim. Rep. 681; *State* v. *Mulholland,* 16 La. Ann. 376.

When distinct offences can be proved: Roscoe on Crim. Ev. 90, 91; *State* v. *Folwell,* 14 Kan. 105; *Mason* v. *State,* 42 Ala. 532; *Commonwealth* v. *Sturtevant,* 117 Mass. 122; *Regina* v. *Cobden,* 3 F. & F. (N. P. C.) 833; *Regina* v. *Reardon,* 4 id. 833; *Heath's case,* 1 Rob. (Va.) 735; *State* v. *Witham,* 72 Me. 531; *State* v. *Harold,* 38 Mo. 496; *Speights* v. *State,* 1 Tex. App. 551; *Fernandez* v. *State,* 4 id. 419; *Washington* v. *State,* 8 id. 377; *Campbell* v. *Commonwealth,* 84 Pa. St. 187.

When the crime charged is one of a system of mutually independent crimes, executed in pursuance of a preconcerted plan, it is proper to prove such other crimes for the purpose of showing the system or plan, and the intent and purpose, of the accused in doing the acts which are claimed to constitute the crime charged. Wharton on Crim. Ev. sec. 32, p. 27.

Whenever a party's intent is in issue, it is proper to prove that he has committed or been implicated in similar offences at

about the same time. Wharton on Crim. Ev. sec. 46; *Jackson* v. *People*, 18 Bradw. 508; *Jordan* v. *Osgood*, 109 Mass. 457; *Bottomley* v. *United States*, 1 Story, 135; *Commonwealth* v. *Eastman*, 1 Cush. 189; *Rex* v. *Roberts*, 1 Campb. 399; *Commonwealth* v. *Jackson*, 132 Mass. 16; *Thomas* v. *People*, 59 Ill. 160.

In all cases of a conspiracy, and in all prosecutions for crimes perpetrated in pursuance of a conspiracy, it is proper to show the entire history and plan of the conspiracy, and whatever has been done in pursuance of the conspiracy, in so far as may be necessary to connect the defendants with the crime charged, and to explain their acts and motives, although the defendants may be thereby implicated in numerous overt acts constituting distinct, indictable offences, and although the conspiracy may be disclosed in numerous indictable aspects. Roscoe on Crim. Ev. secs. 92, 93; *Ford* v. *State*, 34 Ark. 649; *State* v. *Greenwade*, 72 Mo. 298; *Bloomer* v. *State*, 48 Md. 521; *Carroll* v. *Commonwealth*, 84 Pa. St. 107; *Tarbox* v. *State*, 38 Ohio St. 581.

Evidence which was competent against either defendant was admissible. *Smith* v. *People*, 115 Ill. 17; *Regina* v. *Rowlands*, 5 Cox's C. C. 436; 3 Russell on Crimes, *164; *Lewis* v. *Lee*, 66 Ala. 480.

Mr. Cʜɪᴇꜰ Jᴜsᴛɪᴄᴇ Sʜᴇʟᴅᴏɴ delivered the opinion of the Court:

The indictment in this case charges the defendants with the crime of conspiracy to obtain money from Cook county by means of false pretences. It was returned into the Criminal Court of Cook county on April 2, 1887, against Adam Ochs, Michael Leyden, John E. Van Pelt, Michael Wasserman, Daniel J. Wren, Harry A. Varnell, John Hannigan, George C. Klehm, James J. McCarthy, Charles F. Lynn, Richard S. McClaughrey, Christian Casselman, Richard M. Oliver, Christian Geils, William J. McGarigle, Frederick W. Bipper, Charles L. Frey and

Edward S. McDonald. McGarigle, McDonald, Hannigan, Bipper and Frey were not put on trial. Klehm and Lynn entered a plea of guilty. The other eleven defendants were tried at the June term, 1887, of said court, the jury rendering a verdict of guilty, and fixing the punishment of Ochs, Leyden, Van Pelt, Wasserman, McClaughrey, Wren and Varnell at imprisonment in the penitentiary for the term of two years, and imposing upon McCarthy, Casselman, Oliver and Geils a fine of $1000 each. After overruling motions for a new trial and in arrest of judgment, judgment was pronounced in accordance with the verdict. Ochs, Leyden, Van Pelt, Wasserman, Wren and Varnell, by writ of error, took the case to the Appellate Court for the First District, where the judgment as to them was affirmed, and they now, by writ of error, bring the record here for review.

At the June term of the court, the defendants, before commencement of the trial, entered their motion to be discharged for want of prosecution, under section 438 of the Criminal Code, and the overruling of this motion is assigned for error. That section is as follows: "Any person committed for a criminal or supposed criminal matter, and not admitted to bail, and not tried at or before the second term of the court having jurisdiction of the offence, shall be set at liberty by the court, unless the delay shall happen on the application of the prisoner. If such court, at the second term, shall be satisfied that due exertions have been made to procure the evidence for and on behalf of the People, and there are reasonable grounds to believe that such evidence may be procured at the third term, it shall have power to continue such case till the third term. If such prisoner shall have been admitted to bail for a crime other than for a capital offence, the court may continue the trial of said cause to a third term, if it shall appear, by oath or affirmation, that the witnesses for the People of the State are absent, such witnesses being mentioned by name, and the court shown wherein their testimony is material."

The Criminal Court of Cook county has twelve terms each year, commencing, respectively, on the first Monday of each month. April 2, 1887, the day on which the indictment in this case was returned into court, was the last day of the March term. The April term commenced on the 4th day of April, and Ochs, Wasserman and Varnell were arrested and admitted to bail April 6, Leyden April 8, and Van Pelt April 9.

The object of this provision of the statute appears to be to fix an absolute limit of time within which the prosecution must bring the prisoner to trial, and beyond which there shall be no continuance on account of the absence of evidence for the People, and to fix, as this limit, three terms of the court. Is the term during which a prisoner is committed or admitted to bail, to be counted as one of these terms? The prisoners in this case, having been arrested and admitted to bail at an early day of the April term, might possibly have been brought to trial at that term. But suppose their arrest and admission to bail had been on the last day of the term, or but just before its adjournment, it would then have been impossible to have brought them to trial at that term, and nothing of default, in that respect, could be attributable to the prosecution. If, in the case supposed, the April term should not be computed as one of the terms, neither should it be, we think, where the commitment or admission to bail might have been at any earlier day in the term. It is to be a fixed and certain rule, in this respect of the first term, which is to apply in all cases where the commitment or admission to bail is during a term, and not to depend on what particular day of the term the commitment or admission to bail might have occurred. There being this peremptory limit of three terms within which the People must bring a prisoner to trial, we think they should be allowed the benefit of that period for the purpose,—that they should have, not two terms and a fraction of another, but three terms,— that is, three full terms. To count the term during which the commitment or admission to bail takes place, as one of the

terms,—as the first term,—would really be but the allowance of two terms, where such commitment or admission to bail should be just at the close of the term.

A statute of Virginia provided, that "every person charged with felony, and held in any court for trial, shall forever be discharged from prosecution for the offence, if there be three regular terms of such court after he is so held, without a trial," unless the delay should be caused by the prisoner. In *Sand's case,* 20 Gratt. 800, the prisoner was brought into court on the first day of the term, and then entered into a recognizance for his appearance, and the Supreme Court of Virginia held that that term should not be counted as one of the three terms which must elapse before the prisoner would be entitled to his discharge under the statute. And see *Bell's case,* 7 Gratt. 646.

Under the interpretation of the statute which we are disposed to adopt, that the term during which the prisoner is committed or admitted to bail is not to be counted as the first term, the prisoners were here brought to trial at the second term,—the June term,—the May term being the first term; and there was no ground for the motion to discharge, and it was properly overruled.

The discharge, by the court, of the jurors Tate, Ostrander and Parks, is assigned for error. After these persons had been accepted and sworn as jurors, but before the panel was completed, the State's attorney filed a petition, verified by affidavit, tending to show that they were improper persons to sit as jurors, and asking the privilege of re-examining said jurors, for the purpose of exercising a peremptory challenge. The court permitted such re-examination, from which it appeared that Tate, who was a stranger to the bailiff who served the special venire, was selected and summoned by the bailiff at the suggestion of another person, who was also a stranger to the bailiff; that Tate and a brother of said Ostrander were intimate associates of Varnell, one of the defendants; that they had met together and discussed the subject of Varnell's

connection with the matters in respect of which the indictment was found, and Tate had expressed a desire that Varnell should not be convicted; that the juror Ostrander was selected and summoned by the bailiff at the suggestion of said brother of Ostrander; that said Parks was an acquaintance of one Kelly, who was acting as a detective or messenger for defendants, and had conversed with him after being summoned as a juror, from which conversation it appeared that he, too, had been pointed out and selected by some person other than the bailiff; that in said conversation Kelly told Parks that certain other parties had given the bailiff Park's name, and that he (Kelly) had just come from Park's house, and something further that was suspicious appeared. Thereupon, the court discharged these jurors. The re-examination tended to show bias on the part of the jurors in favor of the defendants, or one of them, and that there had been the exercise of outside influence to get them upon the jury.

That there is a discretionary power in courts thus to discharge a juror after he has been sworn, is very well settled. *Thomas* v. *Leonard,* 4 Scam. 556; *United States* v. *Morris,* 1 Curtis, 23; *State* v. *Diskin,* 34 La. Ann. 919; *State* v. *Pritchard,* 16 Nev. 101; *State* v. *Bell,* 81 N. C. 591.

It is urged that it is only in the case of the disqualification of a juror that this power may be exercised. But the rule is by no means thus restricted, as a reference to the authorities will show. It was said in *United States* v. *Perez,* 9 Wheat. 580, that it is impossible to define all the circumstances which would render it proper for a court to interfere in the exercise of its discretion in the discharge of a jury. In a case of this character and magnitude, the consequence of a mis-trial, from any cause, would have been hardly less than a public calamity, and it was for the court anxiously to guard against any danger of such a contingency. We can not say that there was here any abuse in the exercise of the discretion of the court. Besides, in *Spies et al.* v. *The People,* 122 Ill. 1, it was recognized that

any error with respect to challenges in the impaneling of a jury should be disregarded, unless an objectionable juror had been forced upon the defendant after the exhaustion of his peremptory challenges. The same principle would seem to apply here, though the particular error complained of is different. It does not appear that the defendants' peremptory challenges were exhausted. And it was expressly stipulated in the case, "that the twelve jurors sworn and retained to try the case were all accepted by the defendants without the interposition of a challenge, objection or exception, there appearing neither to the court, the People, nor the defendants, any objection or cause of challenge to any of them." It does not appear otherwise than that the defendants had a fair and impartial jury. Having this, there would seem to be no just ground for complaint.

Objection is taken to the counts of the indictment, and it is insisted that this prosecution, if there be ground for it, is under the wrong statute.

Section 46 of the Criminal Code is as follows: "If any two or more persons conspire and agree together, with the fraudulent or malicious intent wrongfully and wickedly to injure the person, character, business or property of another, or to obtain money or other property by false pretenses, or to do any illegal act injurious to the public trade, health, morals, police or administration of justice, or to prevent competition in the letting of any contract by the State, or the authorities of any county, city, town or village, or to induce any person not to enter into such competition, or to commit any felony, they shall be deemed guilty of a conspiracy, and every such offender, and every person convicted of conspiracy at common law, shall be imprisoned in the penitentiary not exceeding three years, or fined not exceeding $1000."

In 1877 the General Assembly passed an act entitled "An act to define and punish conspiracies in the State of Illinois," approved April 19, 1877, (Laws of 1877, p. 92,) and which,

in Starr & Curtis' edition, constitutes a section of the Criminal Code, as follows:

"Sec. 74. *Be it enacted, etc.,* That if two or more persons conspire, either to commit any offence against the State of Illinois, or any county, incorporated city, village, town or township thereof, or to defraud the State of Illinois, or any county, incorporated city, village, town or township thereof, in any manner or for any purpose, and one or more of such parties. do any act to effect the object of such conspiracy, all parties. to such conspiracy shall be liable to a penalty of not less than $100 and not more than $5000, and to be imprisoned either in the penitentiary or county jail for any period not exceeding two years,—the time and place of confinement and the amount of the fine to be determined by the jury trying the cause: *Provided, however,* that this act shall not be construed to modify or repeal any other law now in force in this State."

It is contended that the prosecution was erroneously conducted under said section 46, instead of under the statute last named. The indictment contains five counts. The first charges that the defendants and others, on November 1, 1885, etc., feloniously conspired together, with the fraudulent and malicious intent then and there feloniously, wrongfully and wickedly, by divers false pretences, and with indirect means, to cheat and defraud said county of Cook of its moneys, etc. The second count charges a conspiracy to obtain the moneys and property of Cook county by false pretences, and to cheat and defraud the county, and that in pursuance of the conspiracy they did obtain large amounts of goods, moneys, etc., of the value of $100,000, of the county, by false pretences. The third and fourth counts charge a conspiracy between the parties to obtain from the county, by false pretences, divers large sums of money, of the value of $100,000; and the fifth count charges a like conspiracy between the parties, and that in execution thereof, the parties, on the 15th day of November, 1885, did obtain from the county divers valuable written orders.

and warrants, etc., of the value of $100,000, and divers large sums of money, of the value of $100,000, of the personal goods and property of the county, by false pretences, etc. It appears that the State's attorney elécted to proceed under the first four counts of the indictment. These four counts manifestly were framed under said section 46 of the Criminal Code, and the jury were instructed that the proceeding was under that section. The position taken is, that this section has no reference to municipalities, except in the respect of preventing competition in the letting of contracts; that the later statute of 1877, which is an independent act of itself, is aimed at conspiracies against municipalities alone, providing a different punishment than in section 46, and therefore the act of 1877 was designed to apply to cases like the present, and that the prosecution must have been under that act, and not under said section 46, as the design of the legislature was to fix a particular punishment, which is named, for conspiracies against counties which involved any act done towards carrying the same into effect, and the punishment so provided, and no other, could be inflicted. However it might have been otherwise, the force of this position is completely destroyed by the proviso to the act of 1877, which is as follows: "*Provided, however,* that this act shall not be construed to modify or repeal any other law now in force in this State." This leaves free to be pursued, under said section 46, any prosecution which was open to be had thereunder, before the enactment of 1877. Although municipalities be not specifically named in said section 46, the word "another," there used, is broad enough to include them under the statutory rule of construction, that "the word 'person' or 'persons,' as well as all words referring to or importing persons, may extend and be applied to bodies politic and corporate, as well as individuals." Rev. Stat. 1874, p. 1011.

We think the indictment, the conduct of the prosecution, and the fixing of the punishment, all under said section 46, as was the case, were entirely permissible.

Some point is made as to the sufficiency of the first count, in its charging a conspiracy to cheat and defraud Cook county of its money by false pretences, instead of, in the language of the statute, a conspiracy to obtain the money of the county by false pretences. Whether there is anything of substance in this variance, we need not consider, for even if the count be defective, that would be of no avail, it being the well settled principle that a conviction on a general verdict will be sustained, although some of the counts are faulty, if there be one good count in the indictment. (*Hiner* v. *The People,* 34 Ill. 297.) We find the objection with respect to the counts of the indictment to be without merit.

Respecting the question of fact,—the guilt of the defendants,—the claim of the prosecution is, that as early as in 1883 a combination was formed among a number of the county commissioners of Cook county, in which is the city of Chicago, sufficient to control the awarding of contracts for county expenditures, and auditing and allowing bills therefor, and various officials in charge of the hospital, poor house, insane asylum, normal school, court house, and other county institutions, having for its object the defrauding of Cook county, the means employed being the awarding, by the county commissioners, of contracts for supplies and work for the county to those who would pay them commissions and bonuses therefor, and the contractors making up for such payments by rendering false and fraudulent bills containing over-charges, and the county commissioners auditing and approving the bills, and that this combination continued down to the time of the finding of the indictment. All the plaintiffs in error, except Varnell, as well as several of the other defendants in the indictment, were county commissioners of Cook county during all or a portion of the period covered by the indictment. The terms of Ochs and Wasserman began in December, 1882, and expired December 6, 1885. The terms of Leyden and Van Pelt began in December, 1883, and continued down to December,

1886. Wren's term began in December, 1884. Subsequent
to 1884, Varnell was the warden of the Cook county insane
asylum. The evidence is voluminous, and there will be no
attempt to refer to or discuss it in detail. A few of the very
many transactions disclosed by the evidence will be adverted
to as illustrative of the methods of the alleged conspiracy.

The witness Robinson testified, that he commenced furnish-
ing goods to the county in 1883; that Moritz Wasserman, a
brother of defendant Wasserman, applied to him, inquiring if
he would do the county business and pay ten per cent com-
mission; he agreed to do so, and paid Moritz Wasserman
several times, down to December, 1883; he then commenced
paying the same commissions to Michael Wasserman, one of
the defendants, in January, 1884, and so paid them several
times during that year; that Adam Ochs succeeded Michael
Wasserman as collector, and he agreed with Ochs to pay twelve
per cent commission, and paid him that several times through
1885; that in 1885, Van Pelt came around and said he was
chairman of the charity committee, and that witness should
pay him three per cent in addition to the twelve per cent,
saying witness should get the business regular, and witness
paid Van Pelt that additional amount several times; that
Wren succeeded Ochs as chairman of the charity committee,
and he paid Wren the commissions five times; that in Janu-
ary, 1886, he commenced paying McGarigle the commissions,
Van Pelt telling him McGarigle would collect thereafter, and
he paid McGarigle several times; that McGarigle collected
of him about $300 above the twelve per cent; he also paid
McGarigle three per cent on the hospital; that he paid McGar-
igle on the twelve per cent, $5900.63 in 1886; that in 1885
and 1886 he paid Varnell, of the insane asylum, and Frey, of
the infirmary, $600 or $800. The witness testified, that in
order to leave him a fair profit after paying all these per-
centages, he made up part of the amount in prices and part in
quantity; that he had no difficulty in getting his bills through.

The witness Jinette supplied goods to the hospital. He negotiated with Bipper, and paid him ten per cent, and paid him, altogether, about $1200, selling most of the goods in 1884 and early in 1885. He testified, that in making up his bills he considered the commission he had to pay to Bipper.

The witness Sharp testified, that his firm furnished the hospital, asylum and infirmary with surgical instruments; that in October, 1884, the druggist at the hospital said he must have a commission, and ten per cent was fixed upon; that he paid Murphy this commission until May or June, when Varnell, of the asylum, came in, and said he controlled the purchases for the three institutions, and there would have to be a commission paid; witness objected, but Varnell said it was all right with the committee, and that "We are no paupers, and don't want any discount to appear on bills." Witness stated that they had before deducted twenty-five per cent discount on their bills; that the May, 1885, bill was sent in to the hospital or asylum with the discount off, and it was not approved, and was returned, and afterwards Varnell came in and said they didn't want the discount off, and it was made out as Varnell directed, and it came back approved, and went through as usual; that they made out all the bills as Varnell directed, until July, when he came in and said McGarigle would attend to the June bill, and a couple of days after Murphy came in and said McGarigle was collector of the syndicate. Witness inquired who was in the syndicate besides McGarigle and Varnell. Murphy said, some commissioners, and would not give any definite answer who. That they made out bills after that at the full list price, and they were approved, and as fast as they were paid, Murphy would come in and collect twenty-five per cent for the syndicate and ten per cent for himself.

The witness Lobstein testified, that Wren applied to him about fixing a vault for the county, and witness gave him an estimate of the cost as $700 or $800, using the old material taken out of another vault, and gave him the estimate of

$1300, using new material; that he used the old material, and handed the bill of $700 or $800 to Wren. The latter told him the bill had been passed for $1300, and to make it that figure, and the difference they would make right; that witness made it all right by giving Wren a check for $504, the difference; that he estimated on another vault, at the court house, $1700, and Wren told him to make it $2225 or $2235, and it would be all right; that witness handed in that figure, got the job, and made out the bill, and gave Wren a county voucher for about $500 for the difference. In 1886 the witness was furnishing lumber and materials for a barn for the insane asylum. He testifies that one day McGarigle said to him there must be something in that job,—a commission; that witness said there would not be much left for him; McGarigle replied, "They all do it, and it will be all right;" that witness, in his bills, added about ten per cent to the prices, to make up the commission.

The witness Clybourne, who furnished gravel, said Kolze approached him upon the subject, and said he thought he could get the contract for witness, and he gave Kolze his price at $15 a car; Kolze said he could get the bill through for $19 a car, if witness would be satisfied with $14; that the $5 difference was for commission, which, Kolze said, they had to have; that the day the contract was awarded, Kolze asked him for $5 a car for 1000 cars, saying he had to have it, and that was the only way witness could do business for the county; that witness that afternoon gave him $2500; that after witness had put in 750 or 775 cars, Kolze and Varnell stopped him, saying they had all they wanted; witness said they had the commission on 1000 cars, and he intended to deliver a thousand cars; Kolze said put in 1000 cars. Then Kolze and Varnell stopped him, after he had put in forty or sixty more, and they wanted him to put in a bill for 1089 cars; they wanted the extra money added for extra money outside of the $5000,—about $2000. Varnell said that was the only way

27—124 ILL.

they could get some extra money. Witness made out a bill for 1089 cars at $19 a car, actually furnishing between 820 and 830, and got paid for 1089 cars. Witness sent Varnell $1800. Kolze told witness he turned over the $5000 to the boys.

The witness Peeiffer, who repaired boilers and furnished bedsteads to Cook county insane asylum and infirmary, testified, that Charley Frey came around and asked if there was any money in those beds; witness replied all he made was twenty-five and fifty cents apiece. Frey said it had to be done, and to send so many short,—twenty-five or thirty. Witness did so, and Frey came around and witness gave him $250. In about a month, McGarigle came around and wanted money on beds and boiler work. Witness objected; McGarigle said pay it, and make it up on some other job; so witness gave him a county voucher for $487. Quite a number of bills for bedsteads and repairing boilers were exhibited, all sworn to and receipted for by wardens Frey and Varnell, which the witness testified were all right, except the extras he charged for to pay the commissioners.

The witness Ireland testified, that about October 1, 1886, Varnell came to their office about putting in cooking apparatus at the insane asylum. He got witness to figure on the job, with the understanding that there was to be twenty-five per cent extra for him. Their estimate was $7021.72, including that per cent. Witness got the order for the work in November, did the work and rendered his bill.

The witness Hitchcock, in the tea, coffee, sugar and spice business, began to do business with Cook county in May, 1884, getting an order through Van Pelt. Witness testified, that after having a few orders he told Van Pelt he was willing to pay thirty-five per cent commission. Van Pelt said he would have to see Varnell and Frey about it. He did so, and after that witness paid Varnell thirty-five per cent on what went to the asylum, and Frey the same for what went to the infirmary;

that after Klehm was made chairman, Van Pelt told him to do business with McGarigle, and witness paid the latter thirty-five per cent; that he paid Varnell, Frey and McGarigle altogether about $1500 to $2000; that he charged enough to make up the commissions and have a profit left; that there were short weights on a number of bills sent to the infirmary.

The witness Evers testified, that in July and August, 1886, he sold six horses to Cook county; that at the time of the sale, Buck McCarthy, Varnell, McGarigle and Wren were present; that he gave them the cost price of the horses, with $15 a head added for profit, and McCarthy told him to add $150 for commission; that three or four days after, McCarthy came to him, and he paid McCarthy the $150, which the latter put in his pocket, saying he was to take it to the pool; that afterwards he sold two more horses, McCarthy and Varnell being present, and McCarthy told him to add $75 to the price, but it never was called for; that he received the warrants for these matters, but they were not paid yet.

The witness Gray testified, that in 1886 he bored a well for the infirmary; that he saw a notice in the paper about it, and spoke to Frey, and then to commissioner Hannigan about it, and then went to the board and sent his card to Van Pelt, who told him he had better see McGarigle. He went to the hospital and saw McGarigle, who said witness' brother had made a pretty good offer, and witness would have to increase it to get the job. His brother had offered $2200. McGarigle told witness to meet him in the board room that day, which witness did, and said then he would give $3000 if he could add the additional $800 to the contract. McGarigle said, all right, and they made an engagement to meet at Kern's on Monday, and witness gave McGarigle $3000, and then he got the contract and rendered bills for the work.

The witness Schneider, commencing on June 19, and ending on December 3, 1886, presented forty-one bills to the county for work done on the hospital, asylum, normal school, infirm-

ary and court house, aggregating $95,680.06. From his books it appears that the actual amount paid out for labor and materials for these institutions was $42,058.55. He testified that he got the contract through Edward McDonald, and there was to be twenty per cent in it for the pool, which witness was to pay; that this twenty per cent was added to the bills, and that they were made out for more labor and materials than were actually furnished.

The witness Bipper testified, that he commenced furnishing meat to the county in January, 1880. The next year he commenced paying for the contract; that in 1883 he paid $4000 to $5000 for the contract, which amount was distributed among different members of the board; that the contract for 1884 cost him $6000, which sum was distributed among commissioners Hannigan, Patrick McCarthy, Niessen, Ochs, Sommers, Van-Pelt, Wasserman and Lynn; that he would give McClaughrey presents, sometimes of $500; that the next year (1884-1885) the meat, bread and milk contracts were thrown together, and $10,000 was paid for the three. He was told the boys expected to have $1000,—the boys being those they had their transactions with. It took ten votes,—a two-thirds vote,—to pass any bill for the payment of money over $500. The witness testified there was a meeting of certain of the commissioners at the Galt house with reference to the letting of these contracts, and Leyden told him they had agreed that Bipper, Heissler & Junge, and Kee & Chappel, and Kolze, should have these contracts, provided they would put up $1000 for each of the commissioners who were in the deal; that of this money he paid Ochs $1000, Hannigan $1000, Leyden $1000, Patrick McCarthy $1000, Van Pelt $1000, Wasserman $1000, McDonald $300, Niessen $800, Lynn $800, McClaughrey $500 or $600.

In every instance where one of these fraudulent contracts was negotiated for in advance by one of the commissioners, or by some third person, the contract was awarded as had been

arranged for, and the commissioners indicted are invariably found voting in favor of the allowance of the false and fraudulent bills rendered.

Upon an examination of the entire testimony in the case, we can have no doubt that the verdict is fully sustained by the evidence.

The great contention on the part of the plaintiffs in error is, that though the evidence may tend to show that there were minor conspiracies between certain ones or groups of the accused, it does not show a general conspiracy in which all the plaintiffs in error were engaged, and that whatever the conspiracy may have been, it was not the specific one charged in the indictment.

As respects the law governing in the proof of a conspiracy, it is stated by Archbold, as follows : "A conspiracy is proved, either expressly, or by the proof of the facts from which the jury may infer it. It is seldom proved expressly, nor can a case easily be imagined in which that is likely to occur, unless where one or more of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the jury may fairly imply it. It is usual to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring is not improbable ; and if to this can be added evidence of any consultations or private meetings between them, then there is a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants in furtherance of the common design. But although the proof above mentioned is desirable, because it satisfies the jury as you proceed, and they are better able to apply the evidence of the overt acts when it is afterwards given, yet it is not essentially necessary, as the jury may imply the conspiracy of all from the overt acts of each." Archbold's Crim. Pr. and Pl. 619.

Mr. Greenleaf says : "The *evidence* in proof of a conspiracy will generally, from the nature of the case, be *circumstantial*. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design, and to pursue it by common means. If it be proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part, and another another part of the same, so as to complete it, with a view of the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. Nor is it necessary to prove that the conspiracy originated with the defendants, or that they met during the process of its concoction, for every person entering into a conspiracy or common design already formed, is deemed, in law, a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design." 3 Greenleaf on Evidence, sec. 92.

We have quoted thus at large, because what is thus announced seems completely to meet and dispose of the point as to there being conspiracies in groups, and not one general conspiracy, and of the conspiracy being of another kind than the one charged, and of objections on that score to the reception of the evidence of individual acts which was received, and to be in justification of instructions which were given.

In some of the transactions in evidence, other than those referred to, where commissions or bonuses were paid, the testimony is silent as to whether false and fraudulent bills were rendered, and in some of the cases the contractors say they rendered fair and true bills. It is claimed that the admission in evidence of such transactions was erroneous.

The crime charged is conspiring to obtain the money of the county by false pretenses, and the false pretenses claimed are these false and fraudulent bills. We think the transactions last named might be laid before the jury as evidence from

which to infer that false and fraudulent bills were to be rendered. Evidence is to be considered in view of the ordinary principles of human action. It is hardly to be supposed that these contractors were thus paying large sums of money gratuitously for the contracts they obtained. The reasonable conclusion would be, that they were to be reimbursed therefor in some way. The natural and the only feasible mode open for that purpose would seem to be to make up for these outlays in their bills to the county. And it would be a matter for the consideration of the jury, for them to weigh and judge of whether or not the payment of these commissions and bonuses by contractors would not, in view of all the testimony in the case, warrant the inference that there was an understanding, expressed or implied, that the contractors were to reimburse themselves in the bills which they rendered for allowance, by excess in charge, either in respect of price, quantity or quality, of what was furnished,—and especially so in view of the evidence that in many cases this was the mode adopted.

It was not essential to the crime charged, that there should have been the obtaining of money by false pretences, or that there should have been false pretences used. It would be enough if there was a conspiracy to obtain money by false pretences. There might have been the conspiracy, and yet it not be carried out. It was the rule that bills should be verified by affidavit. There would be a natural reluctance in a contractor to say on the stand that he had sworn falsely to a bill, and he might perhaps reconcile it with his conscience to say that his bill, with commissions added, was a fair bill, considering, in view of what he had paid, that it was a fair bill. It was for the jury to weigh and judge of the evidence of these transactions in the light of all the testimony, and we think it was properly submitted to the jury for their consideration. While we say, generally, that we find no error in the admission of evidence, there are some particulars of testimony excepted to which require special attention.

In October, 1886, Wren, having certain wagons and harnesses which he wished to dispose of to Cook county, made out a bill for the same in the name of H. C. Walker, under a bill-head of the latter, and appended thereto what purported to be, but were not, the affidavit and signature of Walker, and had the bill presented to the county board allowed and paid, Wren obtaining the money. In February, 1887, there was another similar transaction, in which Wren transferred to the county a buggy belonging to him, and rendered a bill therefor in the name of one Frazer, and in that way obtained his pay from the county. Wren being a county commissioner, was forbidden by law to sell property to the county. No question is made as to the county not getting this property, or as to the price charged not being a fair price. The transaction, by itself, appears to have redounded to Wren's benefit alone, and not to that of any of the other defendants. Still, we do not regard that as material. The conspiracy which the evidence tends to prove, being one for obtaining money from the county by the false pretences of false and fraudulent bills, its scope was comprehensive enough to embrace within it a transaction for the benefit of one or a portion of the conspirators, as well as of the whole. Wren did, here, unlawfully obtain the money of the county by a false pretence. The pretence was of the same kind as in other cases, viz., false and fraudulent bills. We do not feel prepared to say the court erred in admitting the evidence.

Testimony was received that Bipper collected $250 from one Timm, who had been appointed by the board to an official position, which money he gave to Leyden, and that he collected $500 from one who had been appointed county physician, and gave the money to Wasserman. We think this evidence was admissible, upon the same principle as the evidence in regard to commissions, before commented on, as affording ground for inference by the jury of an understanding that there might be reimbursement had for the money paid, by the rendering of false and fraudulent bills to the county.

Evidence was admitted of the payment of money by a party to the commissioners, or some of them, for voting that no appeal be taken from his judgment against the county; that the same was done in another case, and that there was a like payment of money upon the sale of the county's reform school property. We do not perceive in what way this evidence tended to prove the charge laid in the indictment, or to form any ground for inference in regard thereto. The transactions do not look, in any way, to the obtaining of money from the county. If they evidence anything of a conspiracy, it is one to commit bribery, and not to obtain money from the county by false pretences. They would seem to be but mere cases of bribery, and the evidence should not have been admitted. But is the error one of sufficient importance to cause a reversal of the judgment? We think not. In every one of the numerous transactions in evidence where commissions or a bonus was paid, there was involved the offence of bribery. Where there were so very many instances of bribe-taking in evidence, we can not think that the addition of these three to the number could have had any appreciable effect upon the verdict. As has frequently been recognized by this court, a judgment will not be reversed where error has intervened, if it shall appear, from the whole record, that such error could not reasonably have affected the result. (See *Kirby* v. *The People*, 123 Ill. 436.) We think the present case comes within this rule. The same is to be said, as to affecting the result, with respect to the admission of any other irrelevant evidence which may be found in the record.

It is said this error was intensified by the instruction, on behalf of the State, that any evidence which had been admitted was for the consideration of the jury, and the giving of that instruction is assigned for error. But the defendants' counsel asked the same instruction, which was given by the court, that "the jury should take into consideration all of the evidence elicited from the defendants' witnesses, as well as that

detailed for the prosecution." Surely, it is not for the plaintiffs in error to complain of an instruction when they ask one of the same kind themselves.

It is said the essence of the crime of obtaining money by false pretences is, that the one from whom the money is obtained should believe the pretence to be true; that the county board, of which defendants composed a majority, passed upon bills against the county; that their knowledge was the knowledge of the county, and thus the county knew the pretences to be false; and that it is legally impossible to be guilty of false pretences in obtaining money of another by pretences which he knows to be false. We can not accept this doctrine. The county board are but the agents of the county,—they are not the county,—and their knowledge in such a matter is not, we think, to be imputed to the county as its knowledge. We think that the agent may be guilty of this crime toward his principal, and that county commissioners may be guilty of obtaining money from the county by the false pretence of a false and fraudulent bill, although they individually know the bill to be false and fraudulent. And we think there might be a conspiracy to obtain money of another by false pretences, although accomplishment of the object of the conspiracy might be impossible.

As respects Ochs and Wasserman, especially, the question is raised whether the Statute of Limitations was not a shield as to them, arising from the fact that their terms of office as county commissioners expired December 6, 1885, and perhaps most of the transactions in evidence occurred subsequent to that time, and after they had ceased to be members of the board. The period of limitation here was eighteen months. The indictment was found April 2, 1887, so that the bar of the statute would apply to all acts committed prior to October 3, 1885. The existence of the conspiracy prior to October 3, 1885, having been satisfactorily established, as we think it was, it is necessary for the avoidance of the bar of the statute

to inquire whether there were any overt acts in furtherance of the conspiracy committed by the defendants subsequent to that time. We think the proof of the commission, by all the defendants, of such overt acts subsequent to October 3, 1885, is abundant. The evidence shows, satisfactorily, that Ochs and Wasserman were members of the conspiracy previous to October 3, 1885, and that they adhered to it afterwards, during the whole interval of time to December 6, 1885, by their co-operation, as members of the board, with their fellow conspirators, in the passing of these false and fraudulent bills. They were especially connected with the corrupt transactions with Robinson, which have been adverted to. Moritz Wasserman, a brother of the defendant Wasserman, first approached Robinson, and made the fraudulent contract with him, and, for a while, collected from him the commissions, then defendant Wasserman did so, and lastly, Ochs was collector of them. Robinson testified that he paid Ochs on October 10, 1885, $648.15, on November 19, 1885, $530, and on December 31, 1885, $768.64, and produced his books, showing the charges as made, though Ochs says Robinson did not pay him any money as late as September, 1885. But the uncontradicted evidence is, that the false and fraudulent bills of Robinson were presented and allowed by the board on numerous occasions between October 2 and December 5, 1885, and that Ochs and Wasserman each voted for every one of the bills allowed between the dates mentioned.

In this connection may be noticed an objection made to an alleged ruling of the court, which is complained of as error, in disallowing a question to Robinson, when he commenced making false and fraudulent bills to the county, as if such question had been allowed the answer might have been that false bills were not begun to be made until Ochs and Wasserman ceased to be members of the board. The only foundation for this objection is the refusal of the following questions to Robinson: "When did you commence stealing from the

county by giving false weights and measures?"  "When did you first commence swindling the county?"  "When did you commence defrauding the county?"  The witness had not said that he had done either of these things.  The questions were abusive and improper, and rightly excluded by the court.  Robinson did state, on cross-examination, that he did not know how many of the bills were false,—that he could find some truthful bills; and on examination of them, (which were produced in court,) he said this one of June 22, 1886, for goods furnished the hospital, and that those bills with Varnell were generally straight.  There is no evidence to warrant any inference that Robinson did not commence the making of false bills until after Ochs and Wasserman left the county board.

Complaint is made of the refusal of the following instructions in regard to the Statute of Limitations, asked by the defendants:

"The jury are instructed, that the crime of conspiracy is complete when the agreement or confederacy was entered into, and the offence was then committed.  They are further instructed, that the offence of conspiracy is a misdemeanor, and if the prosecution therefor be not commenced within one year and six months from the time of committing any such offence, there can be no conviction therefor.  Therefore, even though the jury may believe, from the evidence, that the offence of conspiracy was committed by the defendants, or some of them, still if they believe that such offence was committed more than one year and six months before the 2d day of April, A. D. 1887,—the day on which the indictment was returned by the grand jury into this court,—then they must acquit the defendants.

"The jury are instructed, that if there is any conflict of testimony as to whether or not the defendant Adam Ochs was a party to any of the conspiracies charged in this case, at any time during the eighteen months prior to the 2d day of April,

A. D. 1887, the said defendant Ochs is entitled to the pre-
sumption of innocence, and to the benefit of every reasonable
doubt from the jury, in passing upon such conflicting testimony;
and if, after considering the whole testimony on this subject,
the jury entertain a reasonable doubt as to whether or not said
Ochs was in fact a party to any of such conspiracies,—if the
jury find any such existed,—during the period of time above
stated, then they must find the said Adam Ochs not guilty."

A like instruction in reference to the defendant Wasserman
was asked and refused.

The first instruction, as to all the defendants, was faulty and
misleading, in telling the jury that the crime of conspiracy
was complete, and the offence was then committed, when the
agreement or confederacy was entered into, and that the period
of limitation would commence to run from the time of com-
mitting the offence. The instruction was calculated to lead
the jury erroneously to think that the period of limitation
would commence to run from the time a defendant first became
a member of the conspiracy, instead of from the time of the
commission of the last overt act in furtherance of the object of
the conspiracy.

As respects the two instructions asked, severally, by Ochs
and Wasserman, they are faulty in asking the application of
the doctrine of reasonable doubt to the instance of a conflict
of testimony. This court has repeatedly sanctioned the re-
fusal of like instructions as to reasonable doubt, invoking its
application with respect to the belief of particular facts in a
case, instead of to the question of guilt upon the whole case,
or some entire matter of defence or element of the crime. We
can not say the court erred in refusing these instructions.

As respects other instructions given, modified or refused,
we find no material error. The instructions on the part of
the People appear to be substantially correct, and to lay down
the law of conspiracy very fairly to the jury. Seven instruc-
tions were given as asked by the defendants, and eleven others

asked by them were given with some slight modification by the court. The refused instructions were either substantially embraced in instructions which were given, or were such as the court might decline to give without its being imputed as error.

Complaint is made in respect of the conduct of the trial, in the indulgence of harsh and abusive language by the counsel for the People toward the defendants, and in referring to the neglect of some of the defendants to testify in their own behalf. In this last respect we fail to perceive that there was any such palpable violation of the statute which forbids comment on or reference to a prisoner's neglect to testify in his own behalf, as to call for any especial remark. The course of the People's counsel on the trial was not free from censure. There was a harshness of bearing and intemperance of language toward the defendants which it is not pleasant to witness in a record, and which should never be assumed and indulged in against a prisoner on trial. There may perhaps be somewhat of extenuation in the circumstances of the case. Defendant's counsel themselves were not faultless in their own bearing. Thrusting at the People's witness the question, "When did you commence stealing from the county by giving false weights and measures?" and other like questions, was provocative of corresponding language in turn from the other side toward the defendants. The appalling spectacle of official corruption which the evidence presented, could not but have aroused, and evoked expression of, indignant feeling. We can not find cause, in the conducting of the trial, for a reversal of the judgment.

The judgment will be affirmed.

*Judgment affirmed.*