# HYDE *v.* UNITED STATES.

CRIMINAL LAW; PLEADING; ABATEMENT; GRAND JURY; CRIMINAL CONSPIRACY; PRINCIPAL AND AGENT; INSTRUCTIONS TO JURY; APPEAL AND ERROR; PREJUDICIAL ERROR; VERDICT; EVIDENCE; WITNESSES; IMPEACHMENT OF; TRIAL; ARGUMENT TO JURY; JURORS, COERCION AND MISCONDUCT OF; CUSTOM AND USAGE; OBJECTIONS AND EXCEPTIONS; PUBLIC LANDS; SCHOOL LANDS; EVIDENCE OF CONNECTED ACTS; CHARGE TO JURY; CONFESSIONS; STATUTE OF LIMITATIONS.

1. Pleas in abatement in a criminal prosecution, filed about four years after indictment found, showing that the clerk of the jury commission, the body charged with the duty of selecting persons for jury service, unlawfully abstracted some of the names from the box

containing names of prospective jurors, so that the names of some persons who might otherwise have been on the jury which returned the indictment were not drawn for service, show a serious irregularity in the organization of the grand jury, but do not show that it was an illegal body; such pleas are also filed too late, and exceptions thereto by the prosecution are properly sustained.

2. A conspiracy to defraud the United States under U. S. Rev. Stat. sec. 5440, U. S. Comp. Stat. 1901, p. 3676, does not amount to a punishable offense until some act has been committed in furtherance of the conspiracy; and an indictment will lie for such a conspiracy in the jurisdiction where an act in furtherance of it has been committed, although the conspiracy was not actually entered into in that jurisdiction. Where an overt act is committed by one of the parties or by an agent, all are regarded as being personally present with him, and then and there renewing and prosecuting the original agreement. (Following *Lorenz* v. *United States*, 24 App. D. C. 337.)

3. Criminal conspirators are liable for the acts of a third person, performed by their procurement and direction, although he has no knowledge of the conspiracy. If they are acting through him, their guilty knowledge gives character to the act; not his.

4. Where four persons, B., H., D., and S., are indicted for a criminal conspiracy, it is sufficient to show that any two of them entered into the conspiracy; and a direction to the jury, asked by the defendants, that unless the jury shall find H. and B. both guilty as charged, their verdict shall be in favor of all the defendants, is properly refused.

5. Error, if any, in a charge by the trial court, in a criminal prosecution for conspiracy against four persons, to the effect that as some evidence was admitted as against each defendant, it was not admitted as against the others, the verdict might be against one only, is not prejudicial and reversible error, where two of the accused were found guilty.

6. The exclusion of the testimony of a witness for one of four persons charged with criminal conspiracy, which had no bearing upon the specific charges against two of the accused who were found guilty, cannot be properly made the basis of an assignment of error on an appeal by them.

7. It is not error for the trial court in a criminal prosecution to permit the prosecuting officer to show to a witness for the prosecution, who had related a conversation between himself and one of the defendants, a written report made by him of the interview six days after it occurred, in order to refresh the memory of the witness as to the conversation, and to enable him to correct his testimony as to

certain of its details. The report, being practically contemporary with the conversation, is admissible for the purpose of refreshing the memory of the witness, and the matter also is one largely in the discretion of the trial court.

8. Where an unfriendly witness for the prosecution in a criminal case, having testified to certain facts, is shown a contradictory written statement made by him before the trial, to an agent of the prosecution, and denies it to be true, it is permissible to read it to him for the purpose of discrediting him, under D. C. Code, sec. 1073a [32 Stat. at L. 540, chap. 1329], while, if the witness after first denying the truth of such a statement, then admits it to be true, it goes to the jury for what it is worth, discredited, as it necessarily is, by his contradictory statements.

9. Where a witness for the prosecution in a criminal case admits that a written statement made by him before the trial, and read to him at the trial, is true, he makes the statement a part of his testimony, and the statement is a proper subject of comment by the prosecuting officer in his argument to the jury.

10. It is improper for counsel for the accused in a criminal case to argue to the jury that the accused have been substantially deprived of their constitutional right to be confronted by the witnesses against them, when such argument is practically an impeachment of a ruling of the court on the admission of evidence.

11. The trial court cannot properly be said to have in any way coerced the jury to return a verdict in a prosecution of four persons for criminal conspiracy, where, after a trial lasting nearly three months, and after deliberation by the jury for about three days, without their having been able to agree upon a verdict, the jury were instructed that it was permissible for them to find a verdict as to any one of the accused, even if they disagreed as to the others; but the court cautioned them that there could be no conviction unless the conspiracy and overt acts charged were shown; and the jury, shortly thereafter, agreed upon a verdict finding two of the accused guilty and the other two not guilty.

12. The testimony of jurors as to the motives and reasons influencing their verdict will not be received, except where it relates to extraneous influences tending to prevent the exercise of deliberate and unbiased judgment.

13. Testimony that it is a custom of land agents to have applicants for public lands make affidavits in regard to the character and occupation of the land without personal knowledge is inadmissible, as a custom cannot be established in violation of law.

14. An objection and exception on behalf of one of several defendants,

during a trial for criminal conspiracy, passes out of the case with the acquittal of that defendant, and cannot be taken advantage of by those of the defendants who are convicted.

15. Titles to public land acquired in violation of a State statute may be disaffirmed by the State, and annulled in a proceeding for that purpose.

16. It is not essential that a conspiracy to defraud the United States under U. S. Rev. Stat. sec. 5440, U. S. Comp. Stat. 1901, p. 3676, shall contemplate a financial loss to the United States, or that one should actually result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of the government.

17. Whether or not applications to the States of California and Oregon to purchase land acquired by those states from the United States for the benefit of the public schools are fraudulent if the applicants have no personal knowledge as to the character of the land or as to its nonoccupancy (citing *Ballinger* v. *United States*, 33 App. D. C. 302), they are fraudulent if the applicants do not intend to purchase the land for their own benefit, and have made previous contracts or agreements to sell the land.

18. In a criminal prosecution for conspiracy to defraud the United States out of public lands, evidence tending to show acts of forgery of applications for the land is admissible, although conviction is not asked for the forgery, when such acts are so intimately connected with the other acts of the accused as to tend to show a common scheme to defraud. (Following *Ryan* v. *United States*, 26 App. D. C. 74, 6 A. & E. Ann. Cas. 633; and *Burge* v. *United States*, 26 App. D. C. 524.)

19. Part of the charge by the trial court to the jury in a criminal prosecution for conspiracy, *held* not to have had the effect of taking any question of fact from the determination of the jury, and not to have shown that the trial court exceeded the latitude permitted in charging a jury in the Federal courts. (Citing *Maxey* v. *United States*, 30 App. D. C. 63.)

20. Evidence of an alleged confession, not objected to on the ground that it was obtained by improper means by the conspirator who is alleged to have made it, is not prejudicial to a co-conspirator whom it did not and could not affect, but who did so object to it.

21. An indictment for criminal conspiracy is not barred by the statute of limitations as to one of the accused, although the evidence shows that he did not participate in any act in furtherance of the conspiracy within the statutory period, where the conspiracy contemplated acts to be done after it was formed, in furtherance of it,

from time to time, through a series of years, until its object should be accomplished, and such acts were committed by the other conspirators within the statutory period, and were not expressly repudiated by him.

22. An objection to a confession by an alleged criminal conspirator on the ground that it is uncorroborated, and is therefore insufficient to support a conviction, cannot be sustained where there is evidence tending to show the formation of the conspiracy, his complicity therein, and his acts in furtherance thereof, without the confession.

23. One cannot escape the consequences of his criminal acts on the ground that he performed them for hire, and had no other interest in the results to be obtained.

24. The refusal by the trial court to permit the accused in a criminal case to show that certain letters addressed to him had never reached the Dead Letter Office is not prejudicial error, where it is apparent from other evidence that the letters had been unlawfully obtained by agents of the prosecution.

25. As a criminal conspiracy under U. S. Rev. Stat. sec. 5440, may be a continuing offense, each overt act in furtherance of it amounts to a renewal of the original agreement, and the statute of limitations will run only from the date of the commission of the last overt act. (Following in *Lorenz* v. *United States,* 24 App. D. C. 337.)

No. 2097. Submitted April 18, 1910. Decided October 11, 1910.

HEARING on an appeal by two of four persons indicted and tried for conspiracy under U. S. Rev. Stat. sec. 5440, from a judgment of conviction of the Supreme Court of the District of Columbia.                              *Affirmed.*

The COURT in the opinion stated the facts as follows:

The indictment in this case, presented in the supreme court of the District of Columbia, February 17th, 1904, charged John A. Benson, Frederick A. Hyde, Joost H. Schneider, and Henry P. Dimond with entering into a conspiracy to defraud the United States.

The general object of the conspiracy, as alleged, was to obtain titles to land from the United States through fraudulent practices. The indictment is a very long one, consisting of

ninety-four printed pages, and contains forty-two counts.  The same conspiracy is charged throughout, and the several counts allege different overt acts in furtherance of the same.

An act of Congress passed in 1891 [26 Stat. at L. 1095, 1103, chap. 561, U. S. Comp. Stat. 1901, pp. 1535, 1537] empowered the President to set apart in the several States and Territories public lands belonging to the United States, having forests thereon, as public reservations.

An act of June 4th, 1897 [30 Stat. at L. 36, chap. 2], provided that where a tract covered by a bona fide claim, or by patent, is included within the limits of a forest reservation, the owner may relinquish the same to the United States, and select in lieu thereof vacant land, open to settlement, not exceeding in area the tract covered by his claim or patent.  Under a former law, Congress had granted to the States of Oregon and California, for the benefit of public schools, sections 16 and 36 in the surveys of public lands, according to a system then in vogue. The titles to such sections passed by terms of the act to the said states, without the issue of a patent.  Consequently such lands purchased from said states could be surrendered to the United States under the act of 1897, and certificates obtained in lieu thereof for location elsewhere.

The statutes of Oregon and California provided that such school lands might be purchased by any citizen intending to purchase the same in good faith, for his own benefit, and who has made no contract or agreement to sell the same.  The affidavit of the applicant was required to show these essential conditions, and any false statement would defeat the right to purchase. The maximum purchase allowed in California was 640 acres; in Oregon, 320 acres.

After reciting these acts, the indictment charges that Hyde and Benson were engaged in the city of San Francisco, California, in the business of acquiring title to public lands of the United States, outside of reservations, in exchange for school lands within said reservations; that Schneider and Diamond were employees of Hyde and Benson in the conduct of that business; that all of said parties conspired together to defraud

the United States out of large tracts of lands that were open
to selection in lieu of lands surrendered within the reserva-
tions.

It is alleged that Hyde and Benson were to procure the use
of names of applicants for the purchase of school lands from
said State, by paying them small sums of money and by falsely
representing to some of them that they were merely disposing
of their rights to purchase said school lands. Further, by sup-
porting such applications with fraudulent and false affidavits,
in that they would purport to be bona fide affidavits, sworn to
by the persons whose names were signed thereto, whereas in
fact, they would not be bona fide or sworn affidavits, because, in
the first place, they would state that the affiants were persons
qualified under the laws of the States, intending to purchase in
good faith and for their own benefit, and who had entered into
no contract or agreement of sale; while in fact they would not
intend to purchase in good faith, or for their own benefit at all,
but would be knowingly aiding Hyde and Benson in their said
fraudulent practice, or else innocently acting upon their said
false representations; because, also, some of the applications
would not, in fact, have been sworn to by the persons whose
names were signed thereto.

It is further alleged that part of the scheme of Hyde and Ben-
son was to procure in advance of said pretended purchases,
transfers and conveyances of the lands so applied for, and of
such public lands of the United States as should be selected in
exchange for said school lands; they (Hyde and Benson), at the
time of relinquishing said titles to the United States in exchange
for public lands, well knowing that they had been fraudulently
obtained, and intending to defraud the United States out of the
possession and use of said public lands.

The overt acts charged in execution of said general conspiracy
specify many fraudulent applications made for the purchase of
said school lands, false affidavits made in the prosecution thereof,
divers acts done and papers filed in the General Land Office of
the United States, in the Department of the Interior in the City
of Washington, in the District of Columbia; other acts of de-

ception and fraud done in said Department in furtherance of the objects of said conspiracy in procuring titles, as well as the bribery of certain employees of the United States therein.

After long delay, the parties were brought before the court in the District of Columbia to answer this indictment. A demurrer to the indictment, by Hyde, was overruled November 13th, 1905, and the action of the court was affirmed on special appeal to this court April 6th, 1906. *Hyde* v. *United States,* 27 App. D. C. 362.

The next proceeding was an application by both Hyde and Benson to require the United States to file a bill of particulars, which was ordered July 24th, 1906, and complied with. On April 1st, 1908, Hyde and Schneider filed pleas in abatement to the said indictment. These were excepted to by the district attorney, whose exceptions were sustained. The parties were then brought to trial before a jury. Benson and Diamond were acquitted. Hyde and Schneider were found guilty on each and every count in the indictment, save counts 29 and 33, on which the court had directed an acquittal.

*Mr. A. S. Worthington,* for the appellant Hyde:

1. The demurrer to the plea in abatement should not have been sustained.

(1) The defendant in a criminal case has the absolute right to file a plea in abatement after a demurrer to the indictment has been overruled. For order of pleading, see rule 19 of rules of supreme court of District of Columbia of 1894; rule 28 and rule 70 of rules of that court of 1909; 1 Chitty, Crim. Law, sec. 434; 1 Bishop, Crim. Proc. 746, and *Deane* v. *Echols,* 2 App. D. C. 522.

(2) The question whether any pleading has been seasonably filed cannot be raised by demurring to it. The only question involved in the hearing of a demurrer is whether it makes averments which, if true, entitle the pleader to judgment in his favor. True, upon the hearing of a demurrer, the court goes back to the first fault, but it is the first fault in the statement

of the case, and has nothing to do with the time of filing the several pleadings involved.

(3) A grand jury drawn from a box filled by a person who has not a shadow of authority to do so is not a valid body, and cannot find a valid indictment. Thompson & M. Juries, sec. 555; *United States* v. *Gale,* 109 U. S. 65; *R. Co.* v. *Schwab,* 127 Ky. 87; *Dutell* v. *State,* 4 G. Greene (Iowa) 125; *State* v. *Brandt,* 41 Iowa, 593; *Stokes* v. *State,* 24 Miss. 621; *Clare* v. *State,* 30 Md. 164. For method of preparing jury list in the District of Columbia, see D. C. Code, secs. 198 to 204, inclusive. *Agnew* v. *United States,* 165 U. S. 36, has no application, because, first, the objection there was not that there was no grand jury at all, but merely that the court below had improperly filled four vacancies in that body; second, because, under the rules of practice and pleading in force in this jurisdiction, a defendant in a criminal case has, as stated, the right to file a plea in abatement after a demurrer to the indictment has been overruled; and, third, the objection that a plea is filed too late must here be raised by motion to strike out, and not by demurrer.

2. When a conspiracy is alleged to have been entered into in California or Oregon, and only overt acts by one of the conspirators are alleged to have been done in the District of Columbia, the accused may not lawfully be brought to this District, and here tried for the alleged conspiracy.

(This question, although presented to the Supreme Court of the United States in *Hyde* v. *Shine,* 199 U. S. 62, was not decided by the court in that case, for the reason, as stated in the opinion, that the indictment charged that the conspiracy was entered into in the city of Washington. See, however, dissenting opinion of Associate Justice Peckham, concurred in by Associate Justices White and McKenna.)

In transactions under U. S. Rev. Stat. sec. 5440, the overt act is no part of the offense, *United States* v. *Britton,* 108 U. S. 204; *Dealy* v. *United States,* 152 U. S. 539; and *Bannon* v. *United States,* 156 U. S. 464; *United States* v. *Donau,* 11 Blatchf. 168.

There is nothing in the Constitution or laws of the United

States which gives to a court in this District the right and power to punish persons for the crime of conspiracy when that crime was committed in California or in Oregon. Sec. 2, art. 3, Federal Constitution; 2 Elliott's Debates, 400, 550; 4 Id. 209; 6th Amendment, Federal Constitution; Story's, Const. sec. 1781; 11 ops. Atty. Gen. 411; 1 Cooley, Const. Lim. 459-60; *United States* v. *Robinson,* 172 Fed. 107. The English cases are not to be followed on this subject. See *United States* v. *Guiteau,* 1 Mackey, 498; *Ball* v. *United States,* 163 U. S. 662. But if consideration is to be given them, it will be found that the question whether the overt act alone gives jurisdiction in conspiracy has received very little attention in the English courts. Prior to the Revolution it was held in England that the venue must be where the conspiracy was, not where the result of the conspiracy is put in execution. *R.* v. *Best,* 1 Salk. 174, cited in 3 Chitty, Crim. Law, 1142. *R.* v. *Brisac,* 4 East, 162, which furnishes practically the whole foundation for the proposition which is sometimes laid down in text-books, and occasionally finds its way into the *dictum* of some court, that the venue in conspiracy may be at any place where anything is done in the attempted execution of the conspiracy, is no authority for such a proposition.

All that was actually decided in that case was that when the crime of presenting a false voucher was committed in Middlesex county, the English courts sitting in that county had jurisdiction of a prosecution for that offense. The court, while intimating that the conspiracy might also give jurisdiction if overt acts were committed in Middlesex county, expressly declined to pass upon that question.

The English digests and tables of cases cited, approved, questioned, or overruled down to date have been searched for any reference to a case in England in which *R.* v. *Brisac* has been referred to in any way, with the result that but one such case has been found,—*Mulcahey* v. *R.* L. R. 3 H. L. 317,—and the reference there has nothing to do with the question of venue in conspiracy. And only one other case in England since 1803 has been found which touches that question. That case is *R.* v.

*Bolton,* 12 Cox C. C. 87, a case tried in 1871 before Cockburn, Ch. J., in which case there was an indictment for conspiracy against a number of defendants, and it would seem to support the proposition here contended for. The indictment in the case at bar fails to charge that the alleged conspiracy was entered into in California, as it should have done. See *United States* v. *Aaron Burr,* 25 Fed. Cases, 1–181; *Ball* v. *United States,* 140 U. S. 118; Wright, Criminal Conspiracy, 57; Carson, Criminal Conspiracies as Found in the American Cases, p. 187; 1 Roscoe, Crim. Ev. 436; 3 Russell, Crimes, 159. If the language of 2 Bishop Crim. Proc. secs. 61 and 236, is to be construed as stating to the contrary, the cases there cited do not support · the text. The American cases on the general subject are: *People* v. *Maher,* 4 Wend. 229; *Noyes* v. *State,* 41 N. J. L. 418; *State* v. *Nugent,* 71 Atl. 485; *People* v. *Arnold,* 46 Mich. 268; *Bloomer* v. *State,* 48 Md. 521; *Com.* v. *Tuck,* 1 Brewst. (Pa.) 511; *Com.* v. *Gillespie,* 7 Serg. & R. 469; *Com.* v. *Corlies,* 3 Brewst. (Pa.) 575; *Com.* v. *Bartilson,* 85 Pa. 482. In considering the cases in the state courts, it is necessary to bear in mind that in those courts the construction or effect of the Constitution of the United States is not involved, because the provisions of the original Constitution and of the 6th Amendment relating to the place of trial in criminal cases apply only to the Federal courts.

All the cases, either in England or in the United States, have been cited which have been found dealing in any way with the question under consideration. No court in either country (except the court of quarter sessions, in Philadelphia, in *Com.* v. *Corlies, supra*) has yet decided that a criminal agreement is made where one of the parties, in the absence of the other party or parties, or his or their agent, does a single act in pursuance of the agreement.

Other cases which throw an indirect light on this question are: *United States* v. *Smith,* 173 Fed. 227; *United States* v. *Conrad,* 59 Fed. 458; *Homer* v. *United States,* 143 U. S. 207; *Burton* v. *United States,* 196 U. S. 283; *Price* v. *United States,* U. S. Sup. Ct. decided Feb. 21, 1910; *Armour Packing Co.* v.

*United States,* 209 U. S. 55; *United States* v. *Capella,* 169 Fed. 890; *United States* v. *Sauer,* 88 Fed. 249.

3. An overt act by an innocent agent of one of the alleged conspirators will not, in legal effect, transfer the conspirators and conspiracy from another jurisdiction to that in which the innocent agent does that which constitutes the overt act.

From an examination of the cases heretofore cited, it will be seen that there is no authority for the proposition that the mere act of an innocent agent alone, in the absence of all the conspirators, will give jurisdiction as to a conspiracy which it is claimed such act furthers. The only case that contains even a *dictum* to that effect is *R.* v. *Brisac,* in 4 East. If that *dictum* states the law for the United States, then, whenever two or more persons anywhere in the United States employ a lawyer or other agent to represent them in Washington in claims against the United States, either in any of the Departments or before Congress, or the courts, even, they are subject to be brought to Washington to be tried here on the charge that they have been conspiring to defraud the government, and have had an agent here, who, in respect of their claim, has done something here in their interest. That this court will hold that the constitutional provisions giving accused persons the right to be tried where their offense was committed may be thus frittered away we cannot believe.

4. The appellant Hyde had a right to except to the refusal of the Court below to instruct the jury to find a verdict of not guilty as to Schneider. It would seem that, on general principles, and especially under the evidence in this case, if Schneider could not be convicted of conspiring, as charged in the indictment, with Hyde, the latter could not be convicted of conspiring, under the indictment, with Schneider.

5. Under the language of the indictment, the jury could not lawfully convict any of the defendants unless they should find both Hyde and Benson guilty. *Elliott* v. *State,* 26 Ala. 78. .

6. It is not competent in any case where two or more persons are charged with conspiracy, and they are all on trial, to find a verdict against one of them only, in any aspect of the evi-

dence; and, further, as to the defendant Hyde, there was no evidence in the case that would justify a verdict against him alone, even if the principle upon which the court announced that doctrine to the jury is, in the abstract, correct.

As to the second branch of this proposition, it is submitted that all the authorities and every consideration of justice forbid what in this case was held to be the law. Where there is a confession by one, or some other item of evidence which is admissible against him alone, there may be room for the contention that he alone may be convicted. But in this case there is not in the record a word of evidence which was offered against Hyde alone, or which would not have been just as admissible if only the other three defendants had been on trial. Of course in a trial for conspiracy, the separate and independent acts of each defendant are admissible; but they are admissible against all, and for the purpose of showing, by their separate acts, that there is, back of their acts, an agreement under which those acts are performed. If their separate acts do not prove such a precedent agreement, they do not, for the purposes of that trial, prove anything.

On the first branch of the proposition, namely, that a legal verdict cannot be found against one conspirator only, see *R.* v. *Plummer,* L. R. 2 K. B. 1902; *R.* v. *Gompertz,* 9 Q. B. 84; *R.* v. *Thompson,* 16 Q. B. 832; *R.* v. *Manning,* 12 Q. B. 241; 2 McClain, Crim. Law, sec. 981; *United States* v. *Hirsch,* 100 U. S. 33; *People* v. *Olcott,* 2 Johns. Cas. 301, 1 Am. Dec. 168; *People* v. *Arnold,* 46 Mich. 268; *Casper* v. *State,* 47 Wis. 535; *State* v. *Tom,* 13 N. C. (2 Dev.) 569; and *State* v. *Jackson,* 7 S. C. 283.

It does not follow at all that if one of two on trial cannot be convicted alone, even though he has confessed, the evidence of the confession may as well be excluded. Both may have confessed. One may have confessed and the other may have furnished other evidence, admissible only against himself. Attempts to escape, making false statements, writing anonymous letters showing guilty knowledge,—all such facts may be used as evidence against one defendant, and this, co-operating with

the confession by the other defendant, may lead to the conviction of both. But in this case, as already shown, there was absolutely no evidence that could be used against Hyde alone.

7. The refusal of the court to allow the witness Lavenson, Benson's principal clerk, to testify that he had no knowledge as to how Hyde's applications for State lands were obtained or filed, and that, so far as he, Lavenson, could tell, Benson did not know, was error.

8. The action of the court was erroneous in allowing the district attorney, on direct examination of his own witnesses, to examine them as to previous statements made by them to the representatives of the government, and in permitting counsel for the government, in the final argument to the jury, to use such testimony as to prior statements of the witnesses as evidence tending to show the truth of the statements, and in interrupting counsel for the defendant Hyde in his argument to the jury when he was claiming in substance that the use made by the government, during the trial, of prior statements of its own witnesses, practically deprived the defendants of the benefit of that provision of the 6th Amendment to the Constitution, which gives the accused in a criminal trial the right to be confronted by the witnesses against him.

By Code District of Columbia, sec. 1073*a*, the former statements of a witness are excluded unless they have been made to the party calling him or his attorney, and are admissible then "for the purpose only of affecting the credibility of the witness."

In this case, against the objection of the defendants, based upon sec. 1073*a*, witness after witness for the government was shown his prior affidavits made to agents of the government, and his statements in those affidavits were got before the jury as affirmative evidence for the government. And the counsel for the government were permitted, over a like objection, to read this parrot-like evidence to the jury, and upon it to ask the jury to convict the defendants. Under such circumstances the defendants were deprived of their constitutional right to be confronted by the witnesses against them.

For the law on the subject, irrespective of the constitutional provision and the section of D. C. Code mentioned, see *Doe* v. *Perkins,* 3 T. R. 750; *Ellicot* v. *Pearl,* 10 Pet. 412; *Welsh* v. *Rogers,* 13 How. 282; *Maxwell* v. *Wilkinson,* 113 U. S. 656; *Vicksburg R. Co.* v. *O'Brien,* 119 U. S. 99; *Putnam* v. *United States,* 162 U. S. 687; *United States* v. *Cross,* 20 D. C. 365; *Weaver* v. *R. Co.* 3 App. D. C. 436; *Richardson* v. *Golden,* 3 Wash. C. C. 109; *Emerson* v. *Nimocks,* 88 Fed. 280; *People* v. *Eclo,* 131 Mich. 519; *Cox* v. *Eayres,* 55 Vt. 33; *O'Neale* v. *Walton,* 1 Rich (S. C.) 234; *State* v. *Jackson,* 7 S. C. 283; *Maloney* v. *Martin,* 81 App. Div. 432.

·9. The action of the trial court in ordering the jury to be kept in the custody of the marshal and his deputies during the trial, and the long confinement of the jury during the trial and after they had retired to consider their verdict, resulted in coercing a verdict; and the trial court erred in overruling the motion of the appellant Hyde that the court permit him to take, in open court, the testimony, under oath of the jurors, or some of them, to show how they arrived at their verdict.

The refusal of the court to allow the jurors to be examined is reversible on appeal. *Mattox* v. *United States,* 146 U. S. 140. See also *United States* v. *Reid,* 12 How. 366. As to coercion of jury and misconduct of the jury, see *Bucklin* v. *United States,* 159 U. S. 682; *Brown* v. *State,* 127 Wis. 193; *Thomas* v. *Chapman,* 45 Barb. 98; *Sargent* v. ——, 5 Cowen. 106; *State* v. *Byhee,* 17 Kan. 462; *People* v. *Sheldon,* 156 N. Y. 268; *State* v. *Chambers,* 9 Idaho, 673; *Burton* v. *United States,* 196 U. S. 283.

10. It was error for the trial court to refuse to allow John D. Ackerman, as a witness for the defendants, to testify that by the practice of the State land office of California, and of attorneys transacting business before that office, for many years, applicants for State lands were allowed to make affidavits on information and belief, only, as to the character and as to the occupancy of the land applied for. See *Hoover* v. *Salling,* 110 Fed. 43.

11. The trial court erred in refusing to permit Mr. Birney,

of counsel for the defendant Benson, in his argument to the jury, to refer, as a piece of evidence in favor of the defendants, to the custom of notaries in California and Oregon to certify to acknowledgments without the personal appearance before them of the person whose acknowledgement was certified; and to the instruction given by the court to the jury in the final charge, in referring to such custom, that it made no difference how universal it was, "except that, if it was universal, it might tend to show that these were the means employed."

12. The instruction of the court to the jury was erroneous, which, in substance, stated that if applicants for State lands, before making their application, had an agreement with other persons to turn the lands over to them, so that the applicants were merely acting as tools or figureheads, the deeds granted by the State, pursuant to such applications, were invalid.

It is claimed on behalf of the appellant that this instruction was erroneous (1) because the deeds referred to were not invalid even as to the State; and (2) because they were good and valid deeds as to all persons except the State.

(1) After the grant was made by the State in these cases, the State did not have even an equitable estate in the land described in the deed. It had no title, legal or equitable, which it could transmit to others. There remained in it only the right to file a bill in equity to set aside the deed. That such a right does not constitute an equitable interest in land, and is not assignable, is too well settled to require extended discussion. *Story,* Eq. Jur. sec. 1040; *Dickinson* v. *Seaver,* 44 Mich. 631; *Sanborn* v. *Doe,* 92 Cal. 152; *Whitney* v. *Killery,* 94 Cal. 151; *Prosser* v. *Edmonds,* 1 Younge, &c. 496; *French* v. *Shotwell,* 5 Johns Ch. 565; *Graham* v. *Railroad Co.,* 102 U. S. 154; *Crocker* v. *Bellanger,* 6 Wis. 667; 3 Pom. Eq. Jur. sec. 1276.

(2) Of the innumerable cases bearing upon the point that deeds such as the court in this instruction told the jury are invalid are absolutely unassailable when the interests of a bona fide purchaser are involved, see *Colorado Coal Co.* v. *United States,* 123 U. S. 307; *Sioux City Land Co.* v. *Griffey,* 143 U. S. 41; *United States* v. *Detroit Lumber Co.* 200 U. S. 321;

*Coope* v. *Brooks,* 8 Or. 222, approved and followed in *Robertson* v. *State Land Board,* 42 Or. 183, and *Miller* v. *Wattier,* 44 Or. 347; *Turner* v. *Donnelly,* 70 Cal. 507; *Doll* v. *Meador,* 16 Cal. 295; *Harrington* v. *Goldsmith,* 126 Cal. 169; *Frasher* v. *O'Connor,* 115 U. S. 111; *United States* v. *Clark,* 200 U. S. 601; *United States* v. *Conklin,* 169 Fed. 177.

13. The refusal of the court to instruct the jury in substance that applications for school lands in California and Oregon were neither false nor fraudulent merely because the applicants did not have personal knowledge as to the character of the land or as to its nonoccupancy was erroneous.

14. The court committed error in refusing to withdraw from the consideration of the jury the evidence relating to the alleged forgery of the name of Elizabeth Dimond, and to alleged forgeries of some of the signatures in the so-called Don Alexander papers, in evidence. See *Boyd* v. *United States,* 142 U. S. 450; *Jackson* v. *People,* 18 Ill. App. 508; *People* v. *Lonsdale,* 122 Mich. 388; *R.* v. *McDonnell,* 5 Cox, C. C. 153; *People* v. *Hopson,* 1 Denio, 574; *Chipman* v. *People,* 24 Colo. 520, 52 Pac. 677; *People* v. *O'Brien,* 96 Cal. 171, 31 Pac. 45; *Albricht* v. *State,* 6 Wis. 74; *Barton* v. *State,* 18 Ohio, 221; *People* v. *Molineaux,* 168 N. Y. 264.

14. The judgment should be reversed because of the language used by the court in the final charge to the jury, instructing the jury, first, "that written evidence, letters, for instance, written by parties at the time, is entitled to peculiar consideration as evidence," and, second, that the jury could not fail to see the importance of the question whether the defendant Dimond wrote the anonymous letters in evidence. See *M'Lanahan* v. *Ins. Co.* 1 Pet. 170; *Tayloe* v. *Riggs,* 1 Pet. 591; *Tracy* v. *Swartwout,* 10 Pet. 80; *Nudd* v. *Burrows,* 91 U. S. 426; *Burdell* v. *Denig,* 92 U. S. 716; *Hicks* v. *United States,* 150 U. S. 442; *Starr* v. *United States,* 153 U. S. 614; *Smith* v. *United States,* 161 U. S. 85; *Brown* v. *United States,* 164 U. S. 221; *Metropolitan R. Co.* v. *Jones,* 1 App. D. C. 200; *Le Cointe* v. *United States,* 7 App. D. C. 16; *Metropolitan R. Co.* v. *Martin,* 15 App. D. C. 552; *State* v. *Gleim,* 17 Mont. 17, 31 L.R.A. 294; *Bradley* v.

*Gorham,* 77 Conn. 211, 66 L.̈ ̇. 74; *Post* v. *United States,* 135 Fed. 1; *State* v. *McCollougn,* 114 Iowa, 532, 55 L.R.A. 378; *State* v. *Willing,* 129 Iowa, 72; *Nelson* v. *McLelland,* 31 Wash. 208, 60 L.R.A. 793; *Nelson* v. *Vorce,* 55 Ind. 455; *Fulwider* v. *Ingels,* 87 Ind. 414; *State* v. *Fisk,* 170 Ind. 166; *State* v. *Musgrave,* 43 W. Va. 672; *Ryder* v. *State,* 100 Ga. 533; *Merritt* v. *State,* 107 Ga. 675; *Knapp* v. *State,* 25 Ohio C. Ct. 571; *State* v. *Tuttle,* 67 Ohio St. 440.

15. The court erred in permitting the introduction of evidence by the witnesses William J. Burns, J. Knox Corbett, and S. J. Holsinger concerning alleged confessions made to them, respectively, by the defendant Schneider; and in refusing to instruct the jury that unless the jury were satisfied that the defendant Schneider was a party to the alleged conspiracy prior to February 17, 1901, his alleged confessions could not bring him within the statute of limitations.

No case has been found in which the precise question involved was decided or even discussed. It must be apparent, however, that in any criminal case in which conspiracy is charged, if it does not appear by evidence of some kind that a defendant has participated in the alleged offense within three years, acquittal must follow as a matter of course. How, then, can this necessary fact of participation within the three years be shown by a confession alone, any more than any other essential part of the *corpus delicti?* See the somewhat analogous case of *Wistrand* v. *State,* 213 Ill. 72.

16. The refusal of the court to permit the defendant Schneider, as a witness for all the defendants, to testify as to promises of benefit made to him by Zabriskie as an inducement to Schneider to make a statement to the witness Holsinger.

The evidence should have been admitted and the jury instructed to consider it in weighing the evidence as to the confession, as was done in *Sparf* v. *United States,* 156 U. S. 51.

17. It was error for the court to refuse to permit the defendants, by the witness Dalzell, chief clerk of the Dead Letter Office, in Washington, to prove that certain envelops addressed to John P. Jones never reached the Dead Letter Office.

18. In refusing to instruct the jury that the statements contained in the so-called Holsinger report of November 12, 1902, were not to be considered even against the defendant Schneider, except as affecting his credibility as a witness, unless the jury believed those statements, or some of them, to be true, the court erred.

19. One who has not consciously or actively participated in carrying out a conspiracy within three years before the finding of an indictment against him is not debarred from the benefit of the statute of limitations because he was an active party to the conspiracy before the three-year period began, and was thereafter acquiescent in the matter, or because, after divulging the alleged conspiracy to the party at whom it was aimed, he refuses to make any further statements about the matter, in court or out of court. *United States* v. *Owen,* 32 Fed. 537; *United States* v. *McCord,* 72 Fed. 159; *United States* v. *Biggs,* 157 Fed. 264; *State* v. *Poynter,* 134 N. C. 609; *United States* v. *Kissel,* 173 Fed. 823; *Ins. Co.* v. *State,* 75 Miss. 24; *Raley* v. *United States,* 173 Fed. 156; *United States* v. *Irvine,* 98 U. S. 450; *Gise* v. *Com.* 18 Pa. 428.

20. The refusal of the court to instruct the jury that there was no evidence in the case tending to show that the defendant Schneider was a party to any conspiracy which contemplated the payment of money to Harlan and Valk was error. *Zuern* v. *Com.* 16 Pa. Super. Ct. 588.

21. The motion in arrest of judgment should have been granted.

*Mr. R. Golden Donaldson,* for the appellant Schneider:

1. The prosecution failed to show that the appellant Schneider was connected with or consciously participated in the alleged conspiracy. His alleged confession on its face shows its lack of competency as evidence. A confession (aside from its demonstrated incorrectness) made with the sole object of revenge renders it valueless as the foundation for a verdict of guilt. If one gave a confession as a result of promised compensation or im-

munity, in order to escape punishment, when moved by either instinct of fear or hope of gain, it would have no weight as evidence. A confession avowedly made for the sole purpose of gratifying vengeance, than which no passion is sweeter to many minds, should be equally worthless. See Bishop, New Crim. Proc. sec. 1221; Wharton, Crim. Ev. secs. 623–627.

Aside from the confessions, there is no evidence connecting Schneider with the alleged conspiracy to defraud the United States. In American law it is thoroughly settled that the uncorroborated confession of a defendant, without proof *aliunde* of the *corpus delicti,* is insufficient to support a conviction. *Flower* v. *United States,* 116 Fed. 246; Wigmore, Ev. sec. 2070; Greenl. Ev. sec. 217; *United States* v. *Boese,* 46 Fed. 917; Wharton, Crim. Ev. secs. 633, 1058; Bishop, New Crim. Proc. sec. 1058; McClain, Crim. Law, sec. 397; *Bines* v. *State,* 118 Ga. 320, 68 L.R.A. 3, and note; *People* v. *Swetland,* 77 Mich. 63.

At most the evidence *aliunde* against appellant gives rise to a bare suspicion that he knew of his employer's alleged purposes as against the United States. But suspicion is not synonymous with knowledge. A trial court, in charging the jury on the subject of corroboration of accomplices, stated that if the facts, outside of his testimony, were sufficient to cast on the defendant a grave suspicion of guilty knowledge, it was sufficient. The supreme court of Georgia, in reversing the case, said that the evidence ought to show the guilt, and not a mere suspicion, whether grave or light. *McCalla* v. *State.* 66 Ga. 346, 348. See also *Binckley* v. *State,* 34 Neb. 757; *Grant* v. *State,* 3 Tex. App. 1; *Marrish* v. *United States,* 168 Fed. 231; *United States* v. *Nunnemacher,* Fed. Cas. No. 15,902.

The evidence having failed to show that, at the time Schneider was engaged in acquiring State lands for defendant Hyde, he knew of Hyde's intent to dispose of them to the United States in exchange for selected land, it cannot follow that if a conspiracy between Hyde and Schneider as to the acquisition of State lands was found to exist, an intent to defraud the United

States can be assumed because of the intent to defraud the States. See *Pettibone* v. *United States,* 148 U. S. 197; *United States* v. *Fout,* 123 Fed. 625.

2. The trial court erred in overruling the motion made by all the defendants, at conclusion of the government's case, to take from the jury all evidence as to Schneider's Oregon transactions, as he was an employee only, and not a conspirator, and in overruling the defendants Schneider's and Dimond's motion to instruct the jury to return a verdict of not guilty as to them because their relation with defendant Hyde was merely that of employer and employees.

If an employee knows that his employer is engaged in a fraudulent undertaking, and, having that knowledge, continues to work for him, having no part in the profits of the fraud, and having personally no intent to defraud, he is not guilty of conspiracy with his employer. See *United States* v. *Newton,* 52 Fed. 275; Wharton, Crim. Law, sec. 1402; *O'Donnell* v. *People,* 110 Ill. 250.

3. It was error for the court to charge the jury that one defendant only could be found guilty, as a verdict in a conspiracy proceeding is void which finds but one defendant guilty, unless the person or persons he conspired with are dead or not on trial, or are unknown.

4. The court instructed the jury that Schneider could not be convicted upon his confession alone, but could be convicted of being in the conspiracy before the three-year period and down to as late as the Holsinger report shows, if, taking the confession together with the whole evidence in the case, it showed his connection with the conspiracy. This was erroneous, because it permitted the jury to range through the whole field of evidence in the case, finding in the evidence against Dimond a reference to Schneider which was not admissible against the latter, finding in evidence against Hyde and Benson also such references, whereas the instruction should have been confined to the Holsinger report and the evidence corroborating the same. The rule is that the *corpus delicti* must be established by some inde-

pendent, corroborative evidence, and that the confession is competent to show a defendant's guilty agency in the crime. The corroborative evidence need not show guilt beyond a reasonable doubt, but from that evidence and from the confession, taken together, guilt must be established beyond a reasonable doubt. *Flower* v. *United States,* 116 Fed. 246; Wigmore, Ev. sec. 2070; *United States* v. *Boese,* 46 Fed. 917. Other cases cited, *supra,* under the first grounds of error.

5. The court erred in its ruling that passive acquiescence by Schneider in the acts of others, without conscious participation therein by himself, within the three years, kept the conspiracy alive as to him. *United States* v. *Kissel,* 173 Fed. 823; *United States* v. *Owen,* 32 Fed. 534; *United States* v. *McCord,* 72 Fed. 159, 165; *United States* v. *Biggs,* 157 Fed. 273. Dissenting opinion of Judge Phelps in *Ware* v. *United States, infra;* *United States* v. *Irvine,* 98 U. S. 450; *United States* v. *Britton,* 108 U. S. 204; *Ware* v. *United States,* 154 Fed. 577; *United States* v. *Raley,* 173 Fed. 159.

*Mr. Daniel W. Baker,* United States Attorney, and *Mr. Arthur B. Pugh,* Special Assistant to the Attorney General, for the United States.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

The question raised by the demurrer to the indictment was settled on the special appeal before referred to.

The second and third assignments of error are founded on the exception taken to the order overruling the pleas in abatement. These relate to the organization of the grand jury. By the terms of the Code of the District, the clerk of the supreme court of the District of Columbia, the marshal, and the collector of taxes, are constituted a commission to, from time to time, make a list of jurors for service in said court; the same to be selected as nearly as may be from the citizens in different parts of the District. The names of all persons on the list shall be written on

a separate and similar piece of paper, so folded that the names cannot be seen, and placed in a box provided for the purpose. Such box shall be sealed and turned over to the clerk of the supreme court for safe-keeping.

The term of service of a grand juror in a criminal court shall begin with each term of the same and end with such, unless the jury shall be sooner discharged. At least ten days before the commencement of each term of the criminal court, the names of twenty-three persons required for service as grand jurors in said court shall be drawn from the box by the clerk, who shall publicly break the seal of the jury box for the purpose.

The pleas alleged the following facts substantially in regard to the selection of the grand jury that presented this indictment. After reciting the general provisions aforesaid, it is alleged that on November 16th, 1903, the said commission made an order appointing one James A. Hartsock clerk of said commission, giving him the right of access to the box containing the names of such jurors. That thereafter, about the 10th of January, 1904, said Hartsock, pursuant to said authority, and by consent of the clerk, who had custody of the box, and unaccompanied by any other person, took the said box in the courthouse, and opened it, and took therefrom all the pieces of paper containing the names of the jurors, and from day to day, during several successive days, replaced in said box the papers containing such names, only as he deemed fit and proper to be replaced, and thereupon returned the said box to the custody of the clerk. That upon January 20, 1904, the names of twenty-three persons required to serve as grand jurors in said court were drawn from said box pursuant to the provisions of the Code, and the grand jury whose term of service began on the 1st Tuesday of February, 1904, was composed of persons whose names were drawn from said box after said Hartsock was given and had exercised control over the contents of said box, as herein above set forth; and said grand jury found and returned said indictment in said case.

It further alleges that between the time said Hartsock ob-

tained access to said box, and between the time the names of the persons constituting the grand jury were drawn therefrom, as aforesaid, no papers containing names of persons were placed in said box by said commission, or by any member thereof, or by any person acting in behalf of said commission, but was composed only of the names left in said box by said James A. Hartsock. Wherefore, the grand jury, which returned the indictment in this case was not a legal body, and had no right to return the indictments against the defendants.

The district attorney demurred to these pleas on the following grounds: 1st, that they were not filed within a reasonable time; 2d, that they do not show that any person or persons on said jury had not the right to be there; 3d, that said commission had the right to have assistance in the placing of names in the boxes and in the withdrawing of surplus names in the boxes; 4th, that said pleas are uncertain, indefinite, and state conclusions of law; 5th, they are filed without leave of the court; 6th, such pleas allege no facts that show injuries or damage to the defendants. This demurrer was sustained, exception to the order being taken.

For obvious reasons, objections to the grand jury ought to be taken at the earliest reasonable moment; and it is well settled that where they disclose irregularities merely in the proceeding of forming the panel, they must be presented by challenge, motion to quash, or plea in abatement, in due order and without unnecessary delay. *United States* v. *Gale,* 109 U. S. 65–70; 27 L. ed. 857–859, 3 Sup. Ct. Rep. 1; *Agnew* v. *United States,* 165 U. S. 36–44, 41 L. ed. 624–627, 17 Sup. Ct. Rep. 235. The only exception to this strict rule of diligence seems to be where the objection shows a violation of some positive requirement of the statute, so that there would be no legally selected jury at all. *Rodriguez* v. *United States,* 198 U. S. 156–164, 49 L. ed. 994–997, 25 Sup. Ct. Rep. 617; *United States* v. *Gale, supra.*

The question presented by the facts alleged in the pleas is whether the action of the secretary of the jury commissioners in withdrawing from the box some of the names properly placed

therein was such as to destroy the legality of the jury. It appears that the names in the box were placed therein by the proper officers. The secretary withdrew some of these names from the box. He added no new names, but simply diminished the number from which the jury was subsequently drawn. He had no authority to do this, nor could he be invested with such authority by the officers charged with the duty of supplying names in the box, yet, as he added no additional names, those left in the box were lawful jurors. The defendants do not complain that the grand jury was made up of persons whose names were not lawfully in the box, but simply that the names of some persons who might have been drawn upon the jury had been unlawfully abstracted. The defendants had no right to have any particular person drawn, and there is nothing in the pleas to indicate that they suffered any prejudice whatsoever by the withdrawal of some of the names. It is not alleged that any improperly selected or disqualified person was drawn upon the jury. The action of the secretary was a serious irregularity, it is true, but it did not necessarily render the grand jury an illegal body. We are of the opinion that the pleas came too late, and that there was no error in sustaining the exceptions thereto.

The fourth and fifth assignments go to the question of jurisdiction of the court of the offense proved. The contention, presented on the motions to direct a verdict of acquittal and on exceptions to the charge, is that, notwithstanding the evidence may have tended to establish a conspiracy entered into in the states of California and Oregon, there was none to show that it had been entered into in the District of Columbia; and the commission of an act in the said District by one of the conspirators, in furtherance thereof, cannot confer jurisdiction of the offense—of the conspiracy itself.

The opposing view maintained by the court is stated in the charge substantially to this effect: If the defendants actually conspired to defraud the United States, as charged in the indictment, and to accomplish their purpose by doing or having done in the District of Columbia any one of the things alleged as to be done there, and any of such things were done there pur-

suant to said agreement, then it is the same as if they had all been there and actually engaged in doing the same. As far as such acts are concerned, they are to be treated as having been performed there by the defendants in person. If performed for the purpose of carrying out the agreement, said agreement is contained in the acts, and the conspiracy is there as truly as if all of the defendants were there in person, doing these things with the common mind and purpose which contemplated them.

While the question presented was not actually determined by the Supreme Court of the United States when this indictment was before it in the proceedings for the extradition of Hyde, it was said that there are many authorities to the effect that an indictment will lie for conspiracy in the jurisdiction where an act in furtherance thereof may have been committed. *Hyde* v. *Shine,* 199 U. S. 62–76, 50 L. ed. 90–94, 25 Sup. Ct. Rep. 760. To this effect are the following decisions: *R.* v. *Brisac,* 4 East, 164; 8 Eng. Rul. Cas. 138; *People* v. *Mather,* 4 Wend. 229–259, 21 Am. Dec. 122; *Com.* v. *Gillespie,* 7 Serg. & R. 469–478; 10 Am. Dec. 475; *Com.* v. *Corlies,* 3 Brewst. (Pa.) 575–578; *Com.* v. *Bartilson,* 85 Pa. 482–489; *Noyes* v. *State,* 41 N. J. L. 418; *People* v. *Arnold,* 46 Mich. 268–275, 9 N. W. 406; *Bloomer* v. *State,* 48 Md. 521–535, 3 Am. Crim. Rep. 37; *People* v. *Adams,* 3 Denio, 190–206, 45 Am. Dec. 468; *State* v. *Grady,* 34 Conn. 118; *Ex parte Rogers,* 10 Tex. App. 655, 38 Am. Rep. 654; *Fire Ins. Cos.* v. *State,* 75 Miss. 24–34, 22 So. 99. In the foregoing cases the conspiracy itself was a complete offense; no act in furtherance of it being necessary to make it punishable.

The doctrine maintained is, we think, for a stronger reason, applicable to the offense of conspiracy as defined in sec.. 5440, Rev. Stat. U. S. Comp. Stat. 1901, p. 3676. By that the conspiracy is the gist of the offense, and must be pleaded with fullness and certainty, but it does not amount to a punishable offense until some act shall have been committed in furtherance of it. It is the conspiracy, plus such act, that constitutes the offense. Hence, while the indictment would lie in the jurisdiction where the agreement was actually entered into, an act there or else-

where would be necessary to conviction. Where the overt act is committed by one of the parties or by an agent, all are regarded as being personally present with him, and then and there renewing and prosecuting the original agreement. *Lorenz* v. *United States,* 24 App. D. C. 337–387. See *United States* v. *Rindskopf,* 6 Biss. 259–268, Fed. Cas. No. 16,165; *United States* v. *Newton,* 52 Fed. 275–283; *Arnold* v. *Weil,* 157 Fed. 429; *Robinson* v. *United States,* 96 C. C. A. 105, 172 Fed. 105, 108.

The sixth assignment of error is founded on an exception taken to the refusal of the court to give the 12th special instruction asked by the defendants, as follows: "If the jury are not satisfied by the evidence, beyond a reasonable doubt, that the defendant Diamond, in filing or causing to be filed in the office of the Commissioner of the General Land Office, in Washington, the several papers which are set forth as overt acts in counts 2 to 14; 15 to 21; 23 to 28; and 30 to 34,—all inclusive,—of the indictment, was in collusion with one or more of the defendants in attempting to defraud the United States by the means set forth in the indictment, or some such means, they will render a verdict of not guilty as to all of the defendants, as to each of the said counts."

In disposing of this instruction it must be noted that in several of the counts it is charged that evidence was offered tending to prove that Hyde himself executed certain papers necessary to procure the exchange of certain land, mailing the same to the General Land Office at Washington, District of Columbia, where they were required to be acted upon. So far, then, as he is concerned, and Schneider with him, as they pertain to certain purchases applied for by Schneider in fictitious names, apparently, these constituted the performance of material acts in furtherance of the conspiracy in the District of Columbia, and the completion of the matter there. *Re Paliser,* 136 U. S. 257–265, 34 L. ed. 514–517, 10 Sup. Ct. Rep. 1034; *Horner* v. *United States,* 143 U. S. 207, 36 L. ed. 126, 12 Sup. Ct. Rep. 407; *Benson* v. *Henkel,* 198 U. S. 1–15, 49 L. ed. 919–924, 25 Sup. Ct. Rep. 569; *Burton* v. *United States,* 202 U. S. 344–387, 50 L. ed. 1057–1073, 26 Sup. Ct. Rep. 688, 6 A. & E. Ann.

Cas. 362; *United States* v. *Thayer,* 209 U. S. 39–44, 52 L. ed. 673–675, 28· Sup. Ct. Rep. 426; *Haas* v. *Henkel,* 216 U. S. 462–475, 54 L. ed. 569–575, 30 Sup. Ct. Rep. 249.

But assuming that the acts in the District of Columbia were performed by Diamond alone, and that he was an innocent agent of the criminal principals; that is to say, that he carried out the plans of Hyde and his co-conspirators without knowledge of their criminal scheme,—were they liable for his acts performed by their procurement and direction? They were acting through him, and it was their guilty knowledge and intent that gave character to the act; not his. *R.* v. *Brisac; Com.* v. *Corlies; Noyes* v. *State;* and *People* v. *Adams,—supra.*

The seventh assignment of error relates directly to Schneider, and will be considered with his special exceptions. The eighth is unimportant.

The ninth and tenth assignments of error are based on the refusal of the court to grant the tenth instruction asked by the defendants, as follows: "Unless the jury are satisfied by the evidence, beyond a reasonable doubt, that the defendants Hyde and Benson are both guilty as charged in the indictment on trial, they should render a verdict of not guilty as to all of the defendants."

All four parties were charged with conspiracy, and it was sufficient to show that any two of them had entered into the same. Hyde was found guilty, as was Schneider, and it was not necessary to the guilt of either that Benson be found guilty also.

The eleventh assignment of error is on an exception taken to the following charge of the court: "You will remember that some evidence has been introduced against each defendant, which was not admitted as against the others. For this reason it is possible that there may be a verdict against one only of the defendants, although in fact he could not be guilty alone. That necessarily results because each one is to be tried on the evidence which was admitted against him. As to most of the evidence, it was admitted against all; but there was some evidence—for instance, the alleged confession of Schneider—which was admitted against him only. Now, if the evidence which was admit-

ted against Schneider was sufficient to satisfy you that he did conspire with the other defendants, or some of them, as the court shall charge you may find, then you might convict him, although, when you come to take the evidence against defendants, and to consider what only was admitted against them, you might not find sufficient evidence that had been admitted against them to convict them. The same may be true as against Diamond, against whom a great deal of evidence was admitted that was not received against the other defendants. So it is true there may be a verdict against any of the defendants, whether one or more, as to whom the evidence submitted, received against him or them, proves that he or they conspired as charged, provided an overt act is also proved as charged."

The exception to this, as to the defendant Hyde, was that it was not competent in any case where two or more persons are charged with conspiracy, and are all on trial, to find a verdict against one of them only; and secondly, that as to the defendant Hyde there was no evidence in the case that would justify a verdict against him alone, even if the principle upon which the court announced that doctrine to the jury is, in the abstract, correct.

It would seem to be unnecessary to discuss the proposition embraced in this charge, as it is of no practical importance, since two of the defendants were actually found guilty by the jury.

The fact that Benson was acquitted renders the twelfth assignment, founded on the exclusion of certain testimony of witness Lavenson, immaterial. It had no bearing upon the cases of Hyde and Schneider.

The thirteenth, fourteenth, fifteenth, sixteenth, and seventeenth assignments of error have been presented together by counsel under the following propositions in their brief. These are on exceptions to the action of the court in allowing the district attorney, on direct examination of his own witnesses, to examine them as to previous statements they had made to the representatives of the Government; and in permitting counsel for the government in the final argument to the jury to use such testimony as to prior statements of the witnesses as evidence

.tending to show the truth of the statement; and in interrupting counsel for the defendant Hyde in his argument to the jury when he was claiming, in substance, that the use made by the government, during the trial, of prior statements of its own witnesses, practically deprived the defendants of the benefit of that provision of the 6th Amendment to the Constitution, which gives the accused in a criminal trial the right to be confronted by witnesses against him.

(1) The first exception relates to the examination of the witness Valk. This witness, on his direct examination, had testified that he did not recollect having had any conversation with Benson in regard to forest reserves. The district attorney said: "Now let me see if I cannot refresh your memory. Do you recollect going over the memorandum of your testimony with me a day or two ago?" Witness answered that he did.

An objection was made by the defendant to the district attorney stating that he asked the question for the purpose of refreshing the memory of the witness. The court permitted the examination to proceed. The witness then admitted that he had stated to the district attorney that Benson had said something to him about forest reserves, and that he, Valk, had told Benson that that was outside of his jurisdiction.

As this evidence related solely to Benson, and to no one else, it seems to be of no importance, inasmuch as he was acquitted.

(2) The witness Holsinger had testified to seeing Schneider in Arizona in the fall of 1902, and that Schneider told him that Allen, superintendent of forests, was invited to come to the office and given the privileges of the same, and that he usually entered by the private door to Benson's office. The district attorney showed the witness his report of that interview, and asked him whether it was at Benson's office or at Hyde's that Allen called. Counsel for the defendant objected. The district attorney said: "I will read the report, and ask him to refresh his memory from reading the report." This was objected to by defendant, because the witness had testified that the report was made six days after the witness's interview with Schneider, and that therefore it was not competent for the witness to refresh

his memory by it. The court allowed Holsinger to read his report, and to state that his memory was refreshed by it, and to say that when he spoke of Allen coming to Benson's office he meant Hyde's,—that when he spoke of Benson's office he had Hyde's office in mind,—that he used the names interchangeably, because Schneider told him they were one and the same concern, and he did not know that Benson had a separate office. The memorandum of the witness was made so shortly after the conversation with Schneider as to be practically contemporary, and hence was admissible for the purpose of refreshing his memory. *Putnam* v. *United States,* 162 U. S. 687–694, 40 L. ed. 1118–1121, 16 Sup. Ct. Rep. 923. The matter is one largely within the discretion of the Court. *Putnam* v. *United States, supra; St. Clair* v. *United States,* 154 U. S. 134–150, 38 L. ed. 936–942, 14 Sup. Ct. Rep. 1002.

(3) The witness Tillie A. Fleischauer was evidently unfriendly to the government. In testifying to a conversation with Benson in regard to obtaining a written statement from her regarding her connection with one of the land transactions, she made quite a different statement from that she had previously made to a government agent. He had reduced the same to writing, obtaining her signature thereto. Her testimony concerning the statements of Benson was at some length. She was asked the following question by the district attorney:

Did you not state to Mr. Neuhausen as follows: "One day not more than two years ago, Mr. Benson called me up on the the telephone at my residence, and made an appointment to meet me at the corner of Montgomery and Sacramento streets. He did not state what he wanted to see me about, but when he met me on the street corner he asked me to go to a notary on Montgomery street, and sign some papers." Did you make that statement to Mr. Neuhausen?

*A.* Yes.

*Q.* Is it true?

*A.* Yes, that is true.

*Q.* And did you make the further statement: "I went with

Mr. Benson and signed the papers before the notary, but I have
not the slightest idea what the nature of the paper was. I signed
the papers because I did not wish to hurt Mr. Benson's feelings
by declining to do so. I did not examine the papers at all, and
Mr. Benson did not tell me that they related to land." Did
you make that statement to Mr. Neuhausen?

*A.* Yes.

*Q.* Is that so?

*A.* Yes.

Defendants' counsel asked the court to say to the jury what
these statements were read for.

The court: So far as any contradiction is concerned, this
last, of course, is not a contradiction. She says now that the
statement is true. She modifies her former testimony to that
extent. She says these latter statements are true now, as I un-
derstand it. But I think there was a part of it that was a con-
tradiction.

Defendants' counsel: I ask your Honor to instruct the jury
as to any statements which she made to Mr. Neuhausen, that she
is allowed to state what she said to Mr. Neuhausen only for the
purpose of discrediting her, and not for the purpose of showing
that the statements she made to Mr. Neuhausen are true.

The court: I think it stands like this: She was asked what
she had said to Mr. Neuhausen, and what statements she had
made and signed. So far as she says that, that was true. I al-
low that as refreshing her recollection about the matter. She
remembers that she made a statement formerly to him, and now,
on hearing it read and seeing it, she says it was true. So far as
it is a mere refreshment of her recollection. But where the
statement that she formerly made to Mr. Neuhausen contradicts
what she says here, it simply discredits her to that extent,—
either her memory or her veracity. And the fact that she said it
to Mr. Neuhausen is not any evidence that it was true. That I
understand to be the situation.

Other paragraphs were read to her from her statements to Neuhausen, which she now said were true.

The vexed question as to how far a witness may be contradicted who has taken the party introducing him by surprise has been settled by the Code, sec. 1073a [32 Stat. at L. 540, chap. 1329]. To that extent it would be permissible to read her former statement to the witness. If she had adhered to her last statement, and denied that formerly made, it would have served to discredit her under that section. But instead of persisting in her denial, the witness admitted the truth of her former statement. She simply made that former statement her evidence. The Code makes no provision for this, nor could it well do so. The witness having changed her testimony and now asserted the truth of the former statement, it goes to the jury for whatever it is worth, discredited as it necessarily was by her contradictory statements.

This question, however, does not seem to be a material one, so far as these parties are concerned, because it had application solely to Benson.

(4) Another exception was taken to the remarks made in the course of the argument by one of the counsel of the government.

Counsel for the government, in commenting upon the evidence of the witness Thos. S. Burns, said that Burns was asked a question as to the manner in which he did business for Jno. A. Benson. Having his memory refreshed by the statement read to him that he made to Mr. Neuhausen, and going over the matter again in his mind, he admitted they were all true.

Counsel for the government: Now, you take this whole testimony, gentlemen, and get at, in your own minds, what is the truth of the matter. That is all I want, nothing but the truth. If a witness is on the stand, and he is slow to testify, measure him by his manner on the witness stand. Get from him what he says, and weigh it, and determine for yourselves that which is true and that which is not true. That is your duty as to every witness, gentlemen of the jury, whether it is a witness for the

government or against the government; and I am not denouncing my own witnesses by telling you that.

The district attorney interrupted to say that he [the witness] admitted those statements were true and correct.

Counsel for government: I know he did.   That is what I am reading them for.

Counsel for defendant: I understand the court to admit that, because it was simply a corroboration of what he testified to.

The court: It was not quite that way.

Counsel for defendant: I wish to take an exception to counsel being allowed to use the statement for any purpose, except for the purpose of showing the jury that the witness is not a credible witness.

The Court: The testimony is being used, as I understand, for the same purpose for which it was admitted, which I distinctly stated at the time.   The court allowed his memory to be refreshed by asking him certain questions as to what he had previously said, and on being reminded of those, he said that they were true, thereby making them a part of his testimony.   It was only a method of introducing that evidence, so that he made it his own, and verified it.   The jury have nothing to do with that at all.

This statement, repeated to the jury by counsel, was what each witness, after he had it read to him, said it was true.   The question is practically the same as that disposed of above.   The witness having declared the statement to be true, it was the proper subject of comment by counsel.

(5) Counsel for the defendant Hyde, in the course of his argument, referred to the fact that many witnesses for the government had come into court in chains, by reason of their having been tied down by affidavits made out of court to agents of the government, and when any of the government's witnesses who had been so tied down undertook to depart from their statements, they were thrust in their faces, and they were examined

as to whether such statements were not true. He then proceeded to argue that by this method of procedure the defendants were substantially deprived of their constitutional right to be confronted by the witnesses against them.

The court, interrupting, said that this was an impeachment of the court; and counsel said that he meant in substance and effect the defendants were so deprived of a constitutional right. The court said that was the same thing,—a distinction without a difference. Counsel said that he did not mean to assume the functions of the court, and to tell the jury that the Constitution of the United States had been violated, but that he did say that the "effect of what has taken place has been practically to deprive us of any benefit of that provision." The court then said that was the same thing; that it did not change it a particle, and that the court held that was an improper argument. To which the defendants excepted.

It is plain that this was a comment upon the action of the court, and not an argument on the weight of the evidence or the competency of a witness. It was practically an impeachment of the ruling of the court, and was properly stopped.

The eighteenth, nineteenth, and twentieth assignments of error are on exceptions which relate to the action of the court, alleged to be coercive of the jury in returning a verdict, and to the exclusion of evidence relating to the conduct of the jury.

(1) The court had ordered the jury kept together during the trial, which lasted nearly three months. The case was submitted to the jury "at — o'clock" Friday, June 19th. Monday, June 22d, at 11:30 A. M., the jury returned and announced that they were unable to agree. The court instructed them to retire for further deliberation, and make another effort to agree upon a verdict, charging them, however, that should they render a verdict, it must be one to which they all freely agreed; that the law would not recognize a coerced verdict, or one which was not the free expression of the views and opinions of the jurymen; and that if, after another conscientious effort, the jury still fail to agree, they should return to the court and so state. That it was not the purpose of the court to unduly prolong their delib-

erations, and that if they could not conscientiously and freely agree upon a verdict, they would be discharged.

At ten minutes before 3 o'clock in the afternoon of June 22d, the jury having been brought into the court room by direction of the court, the foreman was asked: "Have you been unable to agree?"

The foreman: We have been unable to agree, sir.

The court: I have one further suggestion to make to you after consultation with counsel. I think I ought to tell you that under the law, as I have held it in this case, and which is settled as the law of this case for this trial, it is possible for you to clear up the record as to part of the defendants, even though you should not be able to agree on others. If you can agree as to any one of the defendants, as to whether he is guilty or not guilty, you may do so. If there are any of the defendants as to whom you can say "guilty" or "not guilty," and all agree, you may return such a verdict, as to such defendants; and as to those defendants touching whom you cannot agree, you may so report. So that I will ask you' to retire to your room, and see if you can decide the case as to any of the defendants, distinguishing carefully between the different counts of the indictment,—especially between the first thirty-four or thirty-five counts, which are outside of the bribery charges, and the last eight counts, I think, which deal with the bribery as overt acts. Begin, for instance, with the defendant Hyde, and say as to the early counts, one by one, whether you find him guilty or not guilty; and then as to the bribery counts, as to those overt acts, whether you find him guilty on those, or not guilty, and so with each of the other defendants. It is possible that you may be able to relieve the docket as to some of the defendants, although you cannot as to all. On the two counts, as directed, you will return a verdict of "not guilty," 29 and 33, I think, are the numbers. So I will ask you to retire and take up that question, and see if you can decide the case to that extent.

After some suggestions by counsel for defendants, the court continued: "In order that there may be no possible misunderstanding, I will remind you again that, of course, you cannot convict under any count, without you find the conspiracy established and the overt acts also; but you might find it as to one defendant on the evidence against him, whereas you could not find it as to the defendants on the evidence against them. But you will take up each count by itself, and remember that it involves the charge of conspiracy and the overt act,—each one."

Shortly thereafter the jury agreed upon a verdict finding Hyde and Schneider guilty and Benson and Diamond not guilty. The trial had been long and tedious, and it was proper for the court to give the jury every reasonable opportunity to agree upon a verdict as to one or all of the defendants. We observe nothing in the record of these proceedings to indicate the slightest attempt to coerce the jury.

(2) The twentieth assignment of error sets up the misconduct of the jury. It is alleged, among other things, that their verdict against these defendants was the result of an agreement made in the jury room after the jury had retired to consider their verdict, between some of the jurors, whose judgment and opinion on all of the evidence was that all of the defendants should be convicted, and others of the jurors, whose judgment and opinion on the evidence was that all of the defendants should be acquitted, and which agreement was, in substance, that if those of the jurors who were in favor of convicting the defendant Benson would join in a verdict of acquittal as to him, those who were in favor of acquitting the defendant Hyde would join in a verdict of conviction as to him; and that if those of the jurors whose opinion on the evidence was that all of the defendants should be convicted would vote for the acquittal of the defendant Diamond, those who were in favor of acquitting all of the defendants would vote for the conviction of the defendant Schneider.

Affidavits accompanied these motions to the effect that from information obtained partly from Gardner and Baruch, two of the jurors, the facts stated in the foregoing motion were learned.

That both jurors declined to make a statement or affidavit of the fact.

The motion for a new trial was postponed until October. On October 27th, 1908, the defendants Hyde and Schneider moved the court for leave to examine the jurors upon their oaths in regard to the charge aforesaid. This was denied.

It is a general rule, founded on the soundest public policy, that the testimony of jurors relating to the motives and reasons influencing their verdict will not be received. The only exception to this rule is where it relates to extraneous influences and external causes tending to prevent the exercise of deliberate and unbiased judgment. *Mattox* v. *United States,* 146 U. S. 140–148, 36 L. ed. 917–920, 13 Sup. Ct. Rep. 50. The facts alleged in the motion do not bring it within the exception.

The twenty-first assignment is an exception taken to the refusal to permit certain inquiries of Ackerman, who was a dealer in land script, and an attorney in the land department of the state of California. Having testified at some length relating to the dealings with Hyde and Benson in the purchase of lands in California reservations, Hyde sought to prove by him that it was the universal custom of land agents to have applicants make affidavits in regard to the character and occupation of the lands without personal knowledge. This was excluded. A custom cannot be established in violation of law, and we fail to perceive how the misconduct of others would justify that of Hyde. For a like and stronger reason, the twenty-second and twenty-third assignments are without merit. Moreover, as the exception was to the refusal to permit counsel for Benson to argue to the jury a custom of notaries in California and Oregon to certify to acknowledgments and affidavits without the appearance of the party purporting to have executed the instruments, the exception passed out of the case with Benson's acquittal.

The twenty-fourth assignment questions a part of the charge relating to the character of titles acquired on the applications for state lands, which reads as follows: "How were these titles in fact obtained? Did the applicants who did make applications for them really apply for them for their own use and benefit

alone, or were they applying for them because they were hired to do so by Hyde and Benson, or either of them, either directly or through Schneider or anybody else? And when they made the application, did they have that understanding with the defendants Hyde and Benson, or their agents, that they would turn them over to them? If that was the situation, then the titles as to the applicants, and as to those who had notice how they were acquired, were fraudulent against the State. The State had said: We will grant these lands only to those who apply for them for themselves, and not to anybody who applies for them to turn right over to somebody else, having an agreement with those other persons to turn them over, so that they are merely acting as tools or figure heads. That was the State statute. The State has said: We will not grant titles in that way; and if anyone undertakes to get titles in that way, they shall be invalid. And if that is the way they were obtained, they are invalid." There can be no doubt that titles acquired in violation of the State statutes could be disaffirmed by the State and annulled in a proceeding for that purpose. *Hyde* v. *Shine,* 199 U. S. 62–80, 50 L. ed. 90–95, 25 Sup. Ct. Rep. 760. The question was not whether the title, not having been assailed, remained in the purchaser, but whether, notwithstanding, the State and the United States had been defrauded in the sense of the statute. "It is not essential that such a conspiracy shall contemplate a financial loss, or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Haas* v. *Henkel,* 216 U. S. 462–479, 54 L. ed. 569–577, 30 Sup. Ct. Rep. 249; *Hyde* v. *Shine,* 199 U. S. 62–81, 50 L. ed. 90–96, 25 Sup. Ct. Rep. 760; *United States* v. *Keitel,* 211 U. S. 370–393, 53 L. ed. 230–242, 29 Sup. Ct. Rep. 123.

The twenty-fifth assignment is on the refusal of the court to instruct the jury that applications for school lands were neither false nor fraudulent merely because the applicants did not have personal knowledge as to the character of the land, or as to its nonoccupancy. The statutes seem to contemplate that such affi-

davits shall be made of personal knowledge. *Ballinger* v. *United States,* 33 App. D. C. 302–309. But the question is immaterial, because the applications were fraudulent by reason of the agreements for transfer.

The twenty-sixth and twenty-seventh assignments relate to the refusal of the court to withdraw from the jury evidence relating to the alleged forgery of the name of Elizabeth Diamond and another. Evidence had been given tending to show that said Diamond was a fictitious person, and that forgeries had been committed in some applications for lands, and it was later announced by the government that conviction would not be asked on those charges of forgery. Defendant's counsel then moved the court to withdraw all of such evidence from consideration, which was overruled, the court holding that the evidence would be admissible if the charges had not been in the indictment. We are of the opinion that these acts were so intimately connected with the others as to be admissible in proof of the common scheme to defraud the United States. *Ryan* v. *United States,* 26 App. D. C. 74-83, 6 A. & E. Ann. Cas. 633; *Burge* v. *United States,* 26 App. D. C. 524-537.

The twenty-eighth and twenty-ninth assignments are on exceptions to a part of the charge as invading the province of the jury. This related to certain letters of Diamond that had been given in evidence, and certain anonymous letters, which proof tended to show had been written by him. Without consuming space, without setting out the part of the charge excepted to, it is sufficient to say that the court referred to the letters as important in that there could be no mistake as to the words used, and the question was as to their meaning and intent; but took no question of fact from the determination of the jury. It seems that only Diamond, who was acquitted, could claim any prejudice from these expressions of the court; but we do not find that the court exceeded the latitude permissible in charging a jury in the United States courts. *Vicksburg & M. R. Co.* v. *Putnam,* 118 U. S. 545-553, 30 L. ed. 257, 258, 7 Sup. Ct. Rep. 1; *United States* v. *Philadelphia & R. R. Co.,* 123 U. S. 113, 114, 31 L. ed. 138, 139, 8 Sup. Ct. Rep. 77; *Simmons* v. *United*

*States,* 142 U. S. 148-155, 35 L. ed. 968-971, 12 Sup. Ct. Rep. 171; *Maxey* v. *United States,* 30 App. D. C. 63-78.

The thirtieth assignment relates to the confessions of Schneider, and embodies several propositions.

There had been evidence tending to show that Schneider was an employee in Hyde's office in the years 1897 and 1898, and that during the latter year he went to Oregon, and there obtained applications for purchases of land, as set out in the indictment. The evidence relating to the procurement of these, and Schneider's connection with Hyde, was sufficient to warrant submission to the jury of the question whether he was cognizant of the fraudulent purposes of his employer, Hyde, and co-operated with him in the execution of the same. Schneider remained in the employment of Hyde as manager of his ranch until about December, 1901, when he left permanently. This leaving was more than three years before the finding of the indictment. There was no evidence as to his actual prosecution of the conspiracy within three years of the time of the indictment. That is, there were no specific acts of performance by him. He was aware that the conspiracy was still active in its purposes, and being pushed, and remained silent, and did not do anything to show that he repudiated or abandoned the scheme until March or July, 1902, when he authorized his attorney Zabriskie to write the General Land Office, and also wrote letters himself, intimating the perpetration of frauds in the business of Hyde and Benson. Holsinger, the witness for the United States, testified that he was a special agent of the Land Office from 1897 to April, 1903, and having seen the letters of Schneider and his attorney, referred to above, went to Arizona in November, 1902, to investigate the matter. In an interview, Schneider made a statement of the facts relating to the land schemes and practices of Hyde and Benson; giving a history of the operations, and said that there had been many fraudulent entries, and that three fourths of all of them were fraudulent. He told of being employed to procure persons to make entries, and, in some instances, of fabricating names. He named two fictitious persons, Jennie P. Blair and Elizabeth Diamond, and

also told of certain United States special agents who were co-
operating with Hyde, and also of certain notaries who were en-
gaged in taking acknowledgments, etc., in collusion with Hyde
and Benson. He expressed anger with Hyde, as he claimed he
had treated him badly, and had made great profits out of the
matter, and given him nothing.

William J. Burns also said he was an agent of the Land
Office. First met Schneider at Tucson, Arizona, in 1903, and
had conversations with him in presence of Corbett. Showed
Schneider Holsinger's report of his statements, and also the
aforesaid letters which he had with him at the time. The wit-
ness was asked what occurred between him and Schneider con-
cerning these papers. Counsel for defendants objected. The
district attorney stated the purpose was to prove that Schneider
read the report made by Holsinger, and admitted the truth of
everything contained therein. Counsel for defendant objected
to the evidence of Burns as well as the witness Corbett, corrobo-
rating the same, on the ground that the admissions and confes-
sions of Schneider were not admissible in the case, even as
against himself, because, under the evidence as it then stood,
he was shown not to have been a party to the alleged conspiracy
within three years before the finding of the indictment; and
on the further ground that there was nothing in the Holsinger
report that tended to show or indicate that the defendant
Schneider had said or admitted that within the period of three
years from the finding of the indictment he had done anything
that was not perfectly proper and legal; or that he had any-
thing to do with any unlawful matter concerned in the indict-
ment in this case, or in the evidence in the case, within the said
period of three years. Another ground was that the evidence
already introduced by the government tended to show two sep-
arate conspiracies, one a conspiracy between Hyde and Schnei-
der in 1898, and another a conspiracy between Hyde and Ben-
son subsequently, and that counsel for the government would
have to elect which of those two conspiracies they would prose-
cute, since they were separate and distinct. The court over-

ruled the objections and instructed the jury that the evidence was received against the defendant Schneider only.

Witness also testified to the letters written by Schneider. He said Schneider was shown them, and he admitted that he wrote and signed them, and sent the authority for the other to be written by Zabriskie. The same exceptions were reserved on the testimony of the letters to the Commissioner from Tucson, Arizona, to corroborate Burns in regard to the interview with and statements made by Schneider.

Two contentions have been made under these assignments: 1st, that the evidence was incompetent; 2d, there was no evidence tending to show an act committed by Schneider in furtherance of the conspiracy within three years before the presentment of the indictment.

As to the competency of the evidence, Schneider himself only urges the general objection. He does not raise the question that the confession was obtained by force, or offer of immunity, or any other improper means. That objection was made by Hyde. As the evidence did not or could not have affected Hyde, it is no ground of complaint by him.

2. We can perceive no ground of objection to the competency of the evidence. It was a confession by Schneider, and was admitted against him for any weight it might be entitled to. The only question was to its weight and legal effect. That question was raised by Schneider on a motion to instruct the jury that, as there was no evidence tending to show that Schneider had taken any part in the conspiracy within three years of the finding of the indictment, he could not be convicted. In other words, that it was necessary to show that he had consciously and intentionally participated in the conspiracy within three years before the finding of the indictment on February 17th, 1904. That the testimony was sufficient to warrant the submission of the question whether Schneider was a party to the original conspiracy, we have already indicated. His active part in the conspiracy was performed three years, or more, before the indictment was found, and thereafter it does not appear that he took

any active part therein.   In refusing the instruction asked by the defendant Schneider, the court charged the jury as follows:

"If Schneider was a member of the conspiracy back of the three-year period, and it was a part of that conspiracy that acts mentioned in the indictment should be done in furtherance of the conspiracy from time to time thereafter as occasion might require through a series of years, until the object of the conspiracy should have been accomplished, although he himself was not to do and did not do anything within the three-year period, and after doing his part he remained acquiescent, expecting and understanding that said further acts would be performed by the other members of the conspiracy, and did nothing to repudiate it or withdraw from it, the acts of the other members of the conspiracy in furtherance of it would be his acts, and would have the same effect against him as if he had done them himself. He would still be acting through his colleagues. He might be playing his part by keeping still as much as he did formerly by acting. If these titles were fraudulent, as alleged, and he assisted in procuring them for the purpose of having them used thereafter by other members of the conspiracy, in effecting the fraudulent exchange alleged in the indictment, he was setting in motion a force which took him along with it, as long as he continued acquiescent and those things were being done which he had contemplated and agreed should be done.

"So, too, if one drops out of a conspiracy, he remains liable for what was done while he constituted a part of it; and he may continue to be in the conspiracy, and to be bound by the acts of his co-conspirators in furtherance of it, even after he has ceased to act in it himself, if he has not in fact withdrawn from it."

No authority has been presented on this proposition, but the view of the court is a reasonable one.   When one performs the part assigned to him in a conspiracy, it is just and reasonable that he should remain bound by the further acts of his co-conspirators, who carry on the succeeding parts of it, if he does not expressly repudiate it or withdraw therefrom.   He enters into

a conspiracy and performs the part assigned to him, knowing that considerable time is necessary to its accomplishment, that successive steps are being taken by others to carry out the unlawful schemes instituted by his efforts, and that its success is dependent upon his secrecy. He ought, therefore, to be held as continuing in it and aiding it, unless he does some affirmative act showing his repentance and repudiation of it.

Another objection to this confession is that an uncorroborated confession of a defendant, without proof *aliunde* of the *corpus delicti,* is insufficient to support a conviction. This objection does not appear to have been specifically made on the trial. If it can be considered at all, it must be regarded as comprehended in the general request for an instruction for the defendant Schneider of a verdict of not guilty. Considering it as raised, however, we see no merit in it. As we have seen, there was proof of the formation and prosecution of the conspiracy and of his actions therein, without his confession. His confession simply renders clearer the conditions surrounding certain applications procured by himself, as well as other details of the fraudulent means used. His conviction was not dependent upon his confession alone.

Another proposition on behalf of Schneider is that he cannot be held as conspirator with Hyde because he was a mere employee of the latter. There is no merit in this contention. Being aware of the conspiracy and of Hyde's purposes, and aiding and abetting therein, he became liable, no matter what his relation to Hyde was. He cannot escape the consequence of his criminal acts on the ground that he performed them for hire, and had no other interest in the results to be obtained.

The thirty-second assignment of error is founded on an exception taken to the refusal of the court to permit the defendants to prove by witness Dalzell that certain envelops addressed to Jno. P. Jones at a postoffice in Mexico never reached the Dead Letter Office. The contention was that while agents of the government were trying to get from Schneider other statements, with a view of using them as evidence in the prosecution of the conspiracy for which an indictment had then been found,

he went into Mexico. Schneider admited he was there under the name of Jno. P. Jones. He gives two reasons for taking an assumed name. One, that he had been considerably "badgered" in Tucson; the other was that he was afraid that the postmaster would take his mail, as he had missed several letters before, and his counsel advised him to take another name. His wife addressed letters to him as Jno. P. Jones. The district attorney produced the envelops referred to, and witness said they were letters addressed to him in Mexico by his wife. The letters were offered in evidence. There were three of them marked "Tuscon," and at the same date when Schneider was in Mexico. Counsel for the government then stated that these letters had been taken from the files of the Interior Department, left there by Burns, who was now in Colorado. Defendant then called Dalzell, chief clerk of the Dead Letter Office, and offered to prove by him that the letters had not passed through his office. Evidence on a collateral issue like this might be admissible under some circumstances; but we see no possible injury that its exclusion could do. It was apparent that these letters had not been transmitted as addressed, and had been wrongfully or unlawfully obtained by agents of the government. The mere fact that they had not passed through the Dead Letter Office added nothing to this fact. Moreover, if the letters had been received in that office, they should have been returned to the writer, and not delivered to other persons.

The thirty-third, thirty-fourth, thirty-fifth, and thirty-sixth assignments of error relate to the confessions of Schneider, and to his exemption from criminal liability by reason of the statute of limitations. These have been considered on behalf of Schneider, and Hyde has no concern in them. In respect of limitations generally, as applied to conspiracy, the doctrine seems to be that, as it may be a continuing offense, each overt act in furtherance amounts to a renewal of the original agreement; hence the statute will run only from the date of the commission of the last overt act. *Lorenz* v. *United States,* 24 App. D. C. 337-387. In that case it was said: "Undoubtedly, as argued, the conspiracy is the gist of the offense defined in sec. 5440, Rev. Stat. (U.

S. Comp. Stat. 1901, p. 3676), though it is not indictable until some act shall have been done by one or more of the conspirators to effect the object of the corrupt agreement. The offense is then complete as to that act, and the statute at once begins to run; but it does not follow that all similar acts thereafter may be committed with impunity. Through the repetition of such acts,—overt acts, as they are commonly called,—the conspiracy is made a continuing offense. By each subsequent act it is repeated and entered into anew." See also *Fire Ins. Cos.* v. *State,* 75 Miss. 24-35, 22 So. 99; *United States* v. *Greene,* 115 Fed. 343-350; *Ware* v. *United States,* 12 L.R.A.(N.S.) 1053, 84 C. C. A. 503-506, 154 Fed. 577, 12 A. & E. Anno. Cas. 233; *United States* v. *Bradford,* 148 Fed. 413-417; *United States* v. *Brace,* 149 Fed. 874-877; *Jones* v. *United States,* 89 C. C. A. 303-313, 162 Fed. 417; *United States* v. *Raley,* 173 Fed. 159; *Ochs* v. *People,* 25 Ill. App. 379-414, 124 Ill. 399-426, 16 N. E. 662.

A few of the assignments of error have not been discussed, but each has received consideration. We find no reversible error in the proceedings excepted to; and the judgment will therefore be affirmed.　　　　　　　　　*Affirmed.*

The appellants applied to the Supreme Court of the United States for the writ of certiorari, and on motion of the appellants, October 13, 1910, the mandate of this court to the court below was stayed until further order of the court.

On December 8, 1910, the Supreme Court allowed the application for the writ of certiorari.